H. F. GOSLIN v. J. M. KURN and JOHN G. LONSDALE, Trustees of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellants.—No. 38477.—173 S. W. (2d) 79.

Division One, July 6, 1943.

*E. G. Nahler, A. P. Stewart* and *Mann & Mann* for appellants.

*Justin Ruark* and *Sizer & Myres* for respondent.

BRADLEY, C.—This cause is under the Federal Employers Liability Act (45 U. S. C. A., Secs. 51-59), and was commenced against the Frisco trustees and the Atchison, Topeka & Santa Fe Railway Company to recover for personal injuries received about 5:30 A. M., December 20, 1940, by plaintiff, a member of a Frisco switching crew, in the Frisco yards at Enid, Oklahoma. The jury found for the Santa Fe, but returned a verdict in favor of plaintiff and against the Frisco trustees for $15,000, upon which judgment was entered. The trustees filed motion for a new trial which was overruled, and they appealed. Plaintiff filed no motion for a new trial as to the Santa Fe and that company went out of the case.

The tracks in the Frisco yards in Enid run east and west. The eastbound mainline track on which plaintiff was injured was the south track. Van Buren street runs north and south and crosses the yards about midway. Kentwood boulevard runs northwest and southeast and crosses the mainline tracks about 150 feet east of the Van Buren street crossing and intersects Van Buren street about 150 feet north of said crossing.

Plaintiff was field man in the switching crew and was standing on Van Buren street on the north side of the eastbound mainline track in order to flag traffic at that crossing, and to look out for traffic at the Kentwood boulevard crossing to the east. The switch engine was on the eastbound mainline track, headed west, and moving west, and was pushing two cars in front at about 4 or 5 miles per hour. Plaintiff intended to board the northwest corner of the front car (called the point), but Gunning, the pin puller in the crew, was on the point, and plaintiff attempted to board the northwest corner of the car next to the engine. He said that when he made such attempt his right foot went into a rut in the street, his left foot missed the stirrup and that he struck the side of the car, resulting in a fracture of the upper femur of the left leg; that at the moment he was blinded by the headlight of a Frisco train on track No. 3, the scale track, and by the headlight of a Santa Fe train on track No.

400

2, the westbound mainline Frisco track; that both these trains were 550 or 600 feet east of the crossing.

Plaintiff alleged that his injuries were caused by the negligence of the Frisco trustees and the Santa Fe, acting separately and conjointly, as follows (we change the sequence from that in the petition):

"The defendants, J. M. Kurn and John G. Lonsdale, negligently, recklessly and carelessly failed to exercise ordinary care to furnish the plaintiff a reasonably safe place in which to perform the duties of his employment in that they ordered him, in the performance of his duties as a switchman in their yards, to work upon and about a certain public street crossing *which was defective in the manner hereinabove set out,* and which defects caused the plaintiff to stumble and lose his footing on the stirrup of the car" (italics ours).

The allegations referred to in the italicized language follows: "That said crossing was approximately ten feet in width, and was so narrow that it did not permit the plaintiff a sufficient space in which to board the freight cars as they passed over said street crossing; that said crossing had a ten of twelve inch decline or dip on the west and on the east side thereof; that the crossing had timbers which were laid unevenly in the crossing, parallel with the tracks, and said defendant trustees had permitted the chat and cinders to become washed out around said timbers, and said crossing was maintained by the defendants so that there were dips and ruts in the crossing which made the place where plaintiff had to perform his duties not reasonably safe."

Plaintiff further alleged: "The defendants, J. M. Kurn and John G. Lonsdale, trustees of the St. Louis-San Francisco Railway Company, their agents, servants and employees did, while operating their freight engine within the yards in Enid, Oklahoma, where plaintiff and other employees were working, negligently, recklessly and carelessly fail to dim the headlight on said engine, and did negligently, recklessly and carelessly operate said engine with its headlight on bright, in violation of the Frisco trustees' rule 114 (amended to read 17) hereinabove set out.

"The defendants, J. M. Kurn and John G. Lonsdale, trustees of the St. Louis-San Francisco Railway Company, their agents, servants and employees did, while operating their freight engine within the yards in Enid, Oklahoma, where plaintiff and other yard employees were working, negligently, recklessly and carelessly fail to dim their headlight on the engine, and did negligently, recklessly and carelessly [82] operate said engine with the headlight on bright, in violation of a long established custom of said trustees, their agents, servants and employees, to dim the headlights on locomotives moving within the yards."

The charge of negligence against the Santa Fe was failing to dim the headlight in violation of the same rule and custom as charged against the Frisco trustees.

The answer of the Frisco trustees was a general denial, assumption of risk and contributory negligence. Since the Santa Fe went out of the case in the trial court its answer is not important here. No reply appears in the record, but no point was made on the absence of a reply, besides the cause was tried as though a reply were filed. See Von Eime et ux. v. Fuchs, 320 Mo. 746, 8 S. W. (2d) 824. Hereinafter, the term defendants has reference to the Frisco trustees unless stated otherwise.

Error is assigned (1) on the refusal of defendants' demurrer to the evidence at the close of the case; (2) on plaintiff's instructions 1, 2, and 3; (3) on the refusal of defendants' instructions C, D, and E; and (4) on an alleged excessive verdict.

As stated, this cause is under the Federal Employers Liability Act, and defendants do not, in the brief, claim that plaintiff's negligence was equal to or greater than that of the defendants, or that his negligence was the sole cause of his injury, or that he, as a matter of law, assumed the risk. They say that "no actionable negligence (of defendants) was shown in either particular (alleged) and for that reason the demurrer to the evidence should have been sustained."

Plaintiff, at the time of injury, had been in the employ of the Frisco and defendants, working in the Enid yards, for about 21½ years. His shift, at the time, was from 11:59 P. M. to 7:59 A. M., and such had been his shift for about 5 months. As appears, supra, he was injured about 5:30 A. M., December 20, 1940. The day was Friday. Plaintiff testified that about a week prior it had rained and the rain froze; "left about three-fourths of an inch of ice on the ground"; that it began to thaw Wednesday, December 18th, and on Friday morning, December 20th, Van Buren street crossing was wet, muddy and slippery. "Q. I want you to tell the jury what the condition of Van Buren street was where you had to stand just north of the north rail of the main track to protect this crossing. A. It had holes and automobiles had hit along this side of the road trying to miss those ruts. Q. How deep were these ruts? A. Why, I suppose some of them were at least five inches deep. Q. What was in those ruts? A. Water and mud. Q. How many ruts were there north of the north rail on the main line track? A. Mister, I don't know. I didn't count them, there were plenty"; that Van Buren street, at the crossing was "13 or 14 feet wide", and "was made out of dirt, cinders, gyp rock and chat"; that gyp rock is used "for making plaster."

And further: "Q. As the engine pushing those two cars went down the mainline track, what did you do as far as Gunning (the pin puller) was concerned? A. I was watching the engine and two

cars come up the main line. When they got almost to me I saw that Gunning was on the point, or northwest corner of the west car. . . . Q. Could you get on the point? A. No. Q. Why couldn't you? A. J. E. Gunning was there. Q. What did you have to do when you saw that Gunning was on the point where you should have boarded the car? A. I had to turn and look again and locate the grab iron on the next car behind, get on that car. . . . Q. Now, as these two cars and this engine being backed west, tell the jury where the light of your switch engine was with reference to the first box car. A. Behind the first box car. Q. Could you see the light on your engine? A. I could not. Q. Were you blinded by the light, if you were blinded by the light of the switch engine? A. No, sir. Q. After you discovered .that Gunning was on your point and you began to look for the grab iron on the second car, did you see another train in the yard? A. I did. Q. Tell the jury what trains you saw and whose trains you saw, if you know. A. 633 of the Frisco from Tulsa, was headed up into the scale track (the [83] second track north from the eastbound mainline track). . . .

"Q. Now, where was the Santa Fe train? A. The Santa Fe train was here, standing or just heading out on this (westbound) main line. Q. Was that a line of the Frisco? A. This is the line of the Frisco. Q. When you were looking down toward the east and looking for the grab iron on the second car that you were going to board, did you see the headlight on the Santa Fe train and on the first train 633? A. I did. Q. Tell the jury whether or not the lights were on dim or bright? A. Bright. Q. Both of them? A. Both of them. Q. I will ask you to state where the reflection—where they were shining, which direction? A. They were shining directly west. Q. About how far was the Frisco train down there? A. It was down about the same distance, about even in there. Q. About how far from the Van Buren crossing? A. 550 or 600 feet, something like that. Q. Now, was this Frisco train, when you were looking there for your grab iron, was the Frisco train, 633, was it moving or standing? A. If it was moving, it was moving so slow I couldn't tell. Q. Was the Santa Fe train moving or standing? A. I think they had just started to move. Q. When you started to grab the grab iron? A. Yes. . . .

"Q. Now, when you looked down there and saw these two bright lights what did you do after Gunning passed you, what did you do with reference to the boarding of that train? What was the first thing you did? A. I reached up to the third grab iron. Q. With which hand? A. My left hand. Q. While you were grabbing with the left hand which direction were you looking? A. East. Q. Was that where the bright lights were? A. Yes, sir. Q. After you took hold of the grab iron with your left hand what did you do next? A. I got hold of the next grab iron with my right hand with my

lantern being in my hand like that (indicating), then I got hold of the grab iron. . . . Q. After you got hold with the left hand and right hand on the grab iron what did you do? A. I turned my head a little, started to run to increase my speed with the box car two or three steps, or whatever it would take, raised my left foot to the stirrup. My right foot went into a rut which caused me to stumble and threw me into the car. Q. When you turned to look where did you look? A. To the west and down. Q. When you did look west and down, what did you see? A. Nothing. Q. Why couldn't you see nothing? A. Because I was blinded from looking into those headlights."

Plaintiff's witness, Carl D. Rice, testified that he went over the crossing on December 19 and 20, 1940; that the crossing was so narrow that lots of times, in driving over it, "he would have to wait until the other car passed on account of it being so rough and bad. Q. Now, what was the condition of the footing, or where the cars crossed, or where a man walking would use it, a pedestrian, what was the condition of the footing in the region, in the neighborhood of the south main line track? A. It was full of chuck holes and at that time they were full of water. . . . Q. What kind of material, if you know, was there in this crossing, this Van Buren street crossing across this main line track there, that is, between the rails and north and south of the rails? A. Well, it looked to me like it had been at one time graveled with rock and some cinders put in. Then they put some white stuff in there and I don't know what it was."

Defendants' evidence tended to show that there were no ruts and chuck holes in the area of the crossing, but it will not be necessary to set out such evidence. It cannot well be said that the evidence on the issue of ruts was not conflicting. But it is argued that "there can be no presumption that the ruts to which plaintiff referred had existed long enough to charge defendants with knowledge of them and give them time to repair them."

Earl J. Shackelford, defendants' yard foreman, whose duty it was to remedy such defects as plaintiff says were in the Van Buren street crossing, said that hundreds [84] of automobiles went over this crossing every 24 hours. And plaintiff testified that "after a rain it (Van Buren street crossing) was pretty well cut up."

The storm was on Saturday and Sunday, December 14th and 15th. It commenced thawing about noon Wednesday. If the crossing "was pretty well cut up" after a rain, as plaintiff says, then considering the traffic and the composition of the street, it is reasonable to infer that it was pretty well cut up in a few hours after the thaw commenced.

The crossing from which plaintiff attempted to board the moving car was the place furnished by defendants for him to work, and it was their duty to exercise reasonable care to furnish him a

404

reasonably safe place to carry on his work. Tash v. St. Louis-San Francisco Ry. Co., 335 Mo. 1148, 76 S. W. (2d) 690, l. c. 696; Bird v. St. Louis-San Francisco Ry. Co., 336 Mo. 316, 78 S. W. (2d) 389, l. c. 392; Markley v. Kansas City Southern Ry. Co., 338 Mo. 436, 90 S. W. (2d) 409, l. c. 410.

A demurrer to the evidence admits the truth of the evidence to which the demurrer is directed, and also admits all inferences of fact which a jury might fairly draw from that evidence; and such demurrer can only be sustained when the facts in evidence and the fair inferences to be drawn from such facts are so strongly against the party at whom the demurrer is directed as to leave no room for reasonable minds to differ. Young v. Wheelock et al., 333 Mo. 992, 64 S. W. (2d) 950, l. c. 954, and cases there cited; Trower v. Missouri-Kansas-Texas R. Co., 347 Mo. 900, 149 S. W. (2d) 792, l. c. 796; Darby v. Henwood et al., 346 Mo. 1204, 145 S. W. (2d) 376, 380.

The question as to whether defendants exercised ordinary care to furnish plaintiff a reasonably safe place to carry on his work was, we think, for the jury, and we so rule. And we rule likewise on the contention that the ruts had not "existed long enough to charge defendants with" notice. It will not be necessary to consider here the other charges of negligence, since we take these up, infra, in ruling the assignments on plaintiff's instructions.

On plaintiff's instructions. The three grounds of negligence charged were submitted in separate instructions, each directing a verdict for plaintiff if the jury found as therein submitted. Instruction 1 submitted the charge that defendants failed to exercise ordinary care to furnish plaintiff a reasonably safe place to carry on his work. This charge was submitted, as follows:

" . . . and if you further find that said defendant trustees, their agents, servants and employees maintained said public crossing at such street in a defective, rough and not reasonably safe condition for the plaintiff to perform his duties in getting off and on freight cars as they passed along and over said crossing on track No. 1, if you so find, and that such failure to keep said crossing in a reasonably safe condition for plaintiff to perform his duties, if you so find, was not, under all the circumstances, in the exercise of ordinary care on the part of the defendant trustees, then you are warranted in finding the defendant trustees guilty of negligence; and if you further find that such negligence. if any, directly and proximately, in whole or in part, contributed to cause plaintiff to stumble and miss his footing on the box car being pushed west over the street crossing, . . ."

The first complaint against instruction No. 1 is that there was no substantial evidence to support submission on the alleged defective condition of the crossing. Such complaint was ruled, supra, on ruling the assignment on the refusal of the demurrer to the evi-

dence. But defendants say that instruction No. 1 is bad because it failed to submit "the particular defect or condition alleged in the petition, or which plaintiff claims, caused him to stumble and miss his footing, namely, a rut into which he stepped." And, absent submission of the particular defect, defendants say the instruction "gave the jury a roving commission to find appellants negligent because of some defective, rough or not reasonably safe condition, other than that alleged or shown to have proximately caused the injury."

The court, at the request of the defendants, instructed that defendants were not "guilty of negligence because of the narrowness" of Van Buren street at the crossing. And, in the instruction on contributory negligence (No. 12) given at defendants' request, is this:

"The court instructs the jury that if you find and believe from the evidence that the roadway on which plaintiff stood, if you so find, in attempting to board the car was *rough and not reasonably* safe" . . . (italics ours).

Instruction No. 12, in effect, submitted the question on the *condition* of the crossing in the same way plaintiff submitted such issue. And such being the situation, defendants cannot complain. Evans v. Atchison, Topeka & Santa Fe Ry. Co., 345 Mo. 147, 131 S. W. (2d) 604, l. c. 611; Johnson v. Chicago & E. I. Ry. Co., 334 Mo. 22, 64 S. W. (2d) 674, l. c. 680. The situation, as we see it, is not one involving the rule that failure to predicate, in a plaintiff's main instruction, a fact or facts *essential* to recovery, cannot be cured by an instruction given on behalf of the defendant.

Plaintiff's instruction No. 2 told the jury that if they found "that there had been a long established custom in said yards to dim the headlights on locomotives *standing or moving* within the yards where yard engines and crews were switching in the night time, if you so find, and that the defendants did, on the night in question, *fail to dim* the headlight on their locomotive within the said yards, and that by reason of said failure plaintiff was blinded by such headlight, if you so find, and if you further find that such failure on their part under all the facts and circumstances, was not in the exercise of ordinary care, then you are warranted in finding the defendants" guilty of negligence, and that if they further found "that such negligence, if any, acting alone or in conjunction with any one or more of the specific grounds of negligence, as in these instructions defined, as against the defendant trustees, in whole or in part, directly and proximately caused the said H. F. Goslin to be blinded by said headlight, and thereby caused to stumble and miss his foothold on said car and receive injuries, if you so find, and that plaintiff did not assume the risks as in these instructions

defined, then your verdict should be for the plaintiff and against the defendants'' (italics ours).

It appears from instruction No. 2 that plaintiff would apply the claimed custom to both standing and moving trains, although he pleaded that it applied only to *moving* trains. Defendants concede that rule No. 17 required the dimming of the headlight on a train "while standing in yards where yard engines are employed." Instruction No. 3 submits the alleged breach of rule No. 17, hence we shall deal here only with the *moving* feature of instruction No. 2.

Was there substantial evidence of the alleged custom? The evidence on the custom question is not extensive. Plaintiff testified: "Q. Do you know what we mean by custom? A. A rule that was established by law and practice. Q. I will ask you to tell the jury what was the custom, if there was one, with reference to the dimming of the lights on running trains inside of the yards? A. It was the custom for the engine man to dim the lights coming into the yards. Q. Was that custom observed by the Frisco employees? A. Yes, sir. Q. Was that custom observed by the Santa Fe employees that used the Frisco yards there? A. Yes, sir."

On cross examination plaintiff testified: "Q. You say that it had been a custom there in the yards for a road engine moving through the yards to dim its headlights through the yards? A. Yes. Q. Every train did that? A. Not every one of them. Q. Did any of them do it? A. Quite a few. Q. What percent did it? A. That is too deep for me." In a statement made by plaintiff to defendants' claim agent, two days after he was injured, he said: "The Santa Fe engine was facing me, and I would judge 33's engine was about the same distance. Both headlights on these engines were burning brightly, and while there is a rule that they should dim their headlights, they never do, and always come in with the headlight burning bright, and on account of these bright headlights, a man has to twist and turn and look closely to see what he is doing, so I had to turn sidewise to keep the lights out of my eyes."

Thomas Burns, engineer on the switch engine with which plaintiff was working, and a witness for defendants, testified: "Q. I will ask you what the custom is with a road engine. I mean a regular train. What as the practice at that time and prior to that time when road engines moved through that yard with reference to their headlight? A. They burn a bright headlight through the yards. When a car is standing still they either dim them or turn them out. Q. If you see a train or engine with its headlight dimmed or turned out entirely in the yards, that is a notice of what? A. He is in the clear. [86] Q. Moving or standing still? A. Standing still."

Gunning, the pin puller, and who had worked in the yards 27 years, as a witness for defendants, testified: "Q. I will ask you the the entire time you have been in those yards when a road engine

with a train moving through those yards, do they keep their headlights burning brightly? A. They keep them burning. Q. That is the custom through there all the time? A. Yes, sir.''

A custom is "a practice or course of acting." This concise definition is approved in Hartman et al. v. Union Electric Light & Power Co. et al., 331 Mo. 230, 53 S. W. (2d) 241, 1. c. 245. It will be noted that plaintiff, in his evidence, defined custom as "a rule that was established by law and practice."

In defendants' brief it is said: "While he (plaintiff) testified to a mere conclusion of fact that there was such a custom, and which testimony was objectionable because it was a mere conclusion, his further testimony on the question as to what the trains actually were in the habit of doing, the thing that gave rise to the custom, if there was one, was that all the trains didn't dim their headlights, a few of them did, but what percentage he was unable to tell." Plaintiff said "quite a few", and not "a few."

It is true that plaintiff's evidence as to the alleged custom was a conclusion and as defendants say, was objectionable, but the trouble is, no objection was made. "To make a custom effective it must be shown to have been general, uniform, certain, and notorious, known to the parties, or so general and universal in its character that knowledge must be presumed." Pankey v. Atchison, Topeka & Santa Fe Ry. Co., 180 Mo. App. 185, 1. c. 199, 168 S. W. 274; McMiens v. United Rys. Co., 274 Mo. 326, 202 S. W. 1082. It would seem from the cross examination of plaintiff, and from the questions asked the engineer and pin puller on the subject of custom, and the failure to object to a conclusion evidence, that able counsel for defendants assumed that plaintiff, the engineer, and the pin puller knew what was required to make a custom.

The question, however, is: Was plaintiff's evidence sufficient to make a submissible issue on the alleged custom? As appears, supra, plaintiff, on direct examination, said that "it was the custom for the engine man to dim the lights coming into the yards." On cross examination he testified: "Q. You say that it had been a custom there in the yards for a road engine *moving* through the yards to dim its headlight through the yards? A. Yes. Q. *Every train did that?* A. *Not every one of them.* Q. *Did any of them do it?* A. *Quite a few.* Q. *What percent did it?* A. *That is too deep for me*" (italics ours). What plaintiff said in the statement, supra, to the claim agent about the violation of the alleged custom would go only to affect his credibility. Jones v. St. Louis-San Francisco Ry. Co., 287 Mo. 64, 228 S. W. 780, 1. c. 784, and cases there cited. Except for the cross examination we have italicized, there could, we think, be no question about plaintiff making a submissible issue on the alleged custom.

"Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no case is made, and the jury should not be permitted to speculate or guess which statement of the witness should be accepted. On the other hand, if, in such a case, the conflicting and contradictory statements of the witness are reasonably explained, or if there are other facts and circumstances in the case tending to show which story of the witness is true, and from a fair consideration of all the facts and circumstances in evidence a jury could reasonably determine which statement of the witness should be accepted as true, then the credibility of the witness and the weight to be given to his testimony are questions for the jury." Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, l. c. 647; Steele v. Kansas City, Southern Ry. Co., 265 Mo. 97, 175 S. W. 177, l. c. 179; Stoll v. First National Bank of Independence, 234 Mo. App. 364, 132 S. W. (2d) 676, l. c. 682; Massey-Harris Co. v. Rich, 233 Mo. App. 509, 122 S. W. (2d) 858, l. c. 866; Swain v. Anders et al., 235 Mo. App. 125, 140 S. W. (2d) 730, l. c. 736.

In former days it was held by a few courts that "one witness was not enough to establish the existence" of a custom, but it is now well settled that a custom may be proved as any other fact. 17 C. J., p. 524, Sec. 92. However, the text cited points out that in practice it is desirable to have at least two witnesses to prove the custom, because the evidence of one witness will not be sufficient "if vague and unsatisfactory." Shields v. Kansas City Suburban Belt R. Co., 87 Mo. App. 637, is cited in support of the text quoted. In that case it appears that the plaintiff was a member of a switching crew; that he was on top of a box car which was in a moving cut of cars, and was at the hand brake, ready to set the brake when the foreman came out from between two cars of the cut and signaled plaintiff that the uncoupling had been made or had not been made; that the foreman failed to make the uncoupling, and instead of so signaling plaintiff, the foreman gave the engineer a stop signal, and the cut of cars were stopped and plaintiff was thrown "down on the track" and injured.

Plaintiff claimed that there was a custom which required the foreman, in the situation, to give the engineer "a slow or cautionary signal" instead of the usual stop signal, so that the stopping would have been less sudden. It was held that the plaintiff's evidence was not sufficient to make a submissible issue on the alleged custom. The court said [87 Mo. App. l. c. 645]:

"There is no statutory or common law, or rule regularly pre-scribed by defendant or adopted by its employees, or, custom general or local, that imposed upon defendant's switchman, after being unable to effect a coupling and emerging from between the cars the duty to give the slow or cautionary signal before giving that to stop the train. The plaintiff did not testify to any knowledge on his part that the slow or cautionary signal was in general or uniform use amongst railway companies, and as no other witness gave any such testimony we must conclude that there was no evidence adduced which tended to establish the fact that it was defendant's duty to give the signal in question."

It is not contended that plaintiff's inability to give the percent of trains that did not dim the headlight when moving in the yards destroyed his evidence that there was such custom. If his positive statement that there was such a custom as he claimed was destroyed it was by his answer, "quite a few", when asked if any trains dimmed headlights when moving in the yards.

The word *quite* means "completely, wholly, entirely totally, . . . to a considerable extent or degree, . . ., as quite near, . . . quite a few—*a good many*" (italics ours). Webster's New International Dictionary, 2d Ed.—Unabridged. Webster defines the word *many* as "consisting of a great number, numerous, not few." Among the definitions of *many* in 26 Words & Phrases (Per. Ed.) 491, is this: "Many is a word of very indefinite meaning, and, though it is defined to mean 'numerous' and 'multitudinous', it is also recognized as synonymous with 'several', 'sundry', 'various', and 'divers.' "

The cross examination of a witness, although it may weaken his evidence on a particular issue given on direct examination, or previously on cross examination, will not be sufficient to justify a holding that such witness gave no substantial evidence on the issue, where different conclusions could fairly be drawn from his evidence in its entirety. Van Hafften v. Clayton et al. (Mo. App.), 259 S. W. 530, 1. c. 533, and cases there cited; Bloecher v. Duerbeck, 338 Mo. 535, 92 S. W. (2d) 681, 1. c. 688.

In the situation, it cannot be said that there was no substantial evidence tending to show the alleged custom as to dimming the headlights on trains *moving* in the yards as submitted in plaintiff's instruction No. 2.

█ Plaintiff's instruction No. 3 was based on the alleged breach of rule No. 17, and is in language, similar to that in instruction No. 2, except as modified to make it applicable to the rule and not the alleged custom. Rule No. 17 follows:

"The headlight will be displayed to the front of every train by night. It must be concealed or extinguished when a train turns out to meet another and has stopped clear of main track, or is standing to meet a train at the end of double track or junctions.

"It must be dimmed while standing in yards where yard engines are employed; approaching stations at which stops are [88] to be made or where trains are receiving or discharging passengers; approaching train order signals indicating orders for delivery; approaching junctions or meeting points or while standing on main track at meeting points, and on two or more tracks when approaching trains in the opposite direction."

The complaint against instruction No. 3 is that there was no substantial evidence tending to show that Frisco train No. 633 was standing at the time in question. Plaintiff's evidence, on direct examination, relative to the train standing, is set out, supra, but for convenience to the reader, we again state it. "Q. Now, was the Frisco train, when you were looking there for your grab iron, was the Frisco train, 633, was it moving or standing? A. If it was moving, it was so slow I couldn't tell." On cross examination, plaintiff testified:

"Q. You testified on direct examination that if it (train No. 633) was moving, it was moving so slow you couldn't tell it, didn't you, this afternoon? A. I answered so many questions, I can't remember. Q. You couldn't tell whether it was moving or not? A. *It was standing still* (italics ours). Q. What makes you think it was standing still? What do you base that statement on that it was standing still? A. How was that? Q. On what do you base that statement? You say you think it was standing still. How do you arrive at that conclusion? A. Because I had to cut that engine off and go to the round house."

It is our conclusion that there was substantial evidence to support instruction 3.

Error is assigned on the refusal of instructions C, D, and E. Instructions C and D, respectively, would have told the jury that there was no evidence that defendants "were guilty of any negligence because of the condition" of the Van Buren street crossing and that there was no evidence of "any violation of rule 17." The rulings, supra, dispose of the assignments on the refusal of C and D.

Defendants' refused instruction E follows: "The court instructs the jury that you cannot, in this case, find the defendants, J. M. Kurn and John G. Lonsdale, trustees, guilty of any negligence because of the failure to dim the headlight on the engine of their train which was *approaching* from the east of the place where plaintiff attempted to board the box car" (italics ours). The ruling, supra, on plaintiff's instruction No. 2 disposes of the assignment on the refusal of defendants' instruction E.

Was the verdict excessive? Plaintiff's injury was a transverse fracture of the left upper femur, and the medical evidence tended to show that he is permanently injured and disabled from functioning again as a member of a switching crew. Defendants do

not deny that such is the case, but it is claimed that at the time of plaintiff's injury he was suffering from Paget's disease, which is said to be incurable and which causes a calcium deficiency in the bones, and bone fractures where such disease exists, are slow to heal, if they heal at all. And defendants say that "the doctors who testified for appellants say that (absent the disease) he should have had a complete recovery in from three to six months. If he had made such a recovery it could not be successfully disputed that the judgment of $15,000.00 was grossly excessive."

Drs. F. A. Hudson and C. H. Benage were witnesses for plaintiff, and Drs. Joseph C. Peden and C. H. Crego, Jr., for defendants. Dr. Hudson treated plaintiff; the others did not, but Dr. Benage examined him. Drs. Peden and Crego examined X-rays of plaintiff.

Plaintiff does not admit that he has Paget's disease, nor does he deny. Dr. Hudson, who treated plaintiff from August, 1941, on cross examination, testified:

"Q. Now the bone condition you describe, is that a deficiency in calcium for one thing? A. Deficiency in calcium in the bone, not throughout the whole bone, but in spots; that gives it that peculiar mottled appearance (in X-ray). Q. Then that cause—the cause of that absorption, is it the result of some condition in the metabolism, is it caused by the condition in the bone? A. I don't know what it is the result of. Q. And that is a condition that exists throughout the entire bony structure of the body, is it doctor? A. No, sir, I have plates there showing in some spots it doesn't, but it is not confined entirely to this particular bone. Q. Then there are other bones, besides the femur that was fractured, that are in the same condition; that have the calcium deficiency, and whatever may have been the cause, the same condition prevails throughout a number of the bones of the body, is that correct? A. That is correct."

Dr. Crego, on cross examination, testified: "Q. A man can have it (Paget's disease) and never know it? A. In the early stages, at first; before the end stages were reached they would know they had it. Q. And a man can or does do ordinary labor with Paget's disease for a long period of time and not know it? A. That is right. Q. You are not attempting to testify how long this man might have had some disease of the bone? A. No, sir. Q. Nor you are not attempting to testify how long he might have continued the work he was doing with that type of injury or disease you have seen in these X-rays? A. That is right. Q. The doctor's don't know? A. That is right. Q. It would be strictly a conjecture on their part if they attempted to limit it to any time of months, days or years? A. That is right." It will not be necessary to set out further evidence of the doctors.

Plaintiff was in the hospital 9 weeks, not able to get out of bed or sit in a chair, and up to the time of the trial, Dr. Hudson's bill

was $319. Other expenses, if any, are not shown. As to his experience in the hospital, suffering, etc., plaintiff testified: "Q. Now, while you were in the hospital what happened to you there with reference to your injuries, what position were you in, etc.? A. I was placed with my left leg in a frame in about this position (indicating). They drilled a hole through the bone in my leg, and put a pin through that bone. There was two pullies with the frame of the bed, with a thirty pound weight. I carried a thirty pound weight on that leg for, I think, about ten days. It was reduced to twenty-five pounds. I carried a twenty-five pound weight on that leg until my leg was taken out of that frame about the first of February."

After being in the hospital 9 weeks plaintiff was taken to his home in Enid, and was in bed at home 2 months, not able to go to the bath room alone. "Q. What kind of pain, if any, have you suffered since this accident? State whether or not you have suffered since this accident and in what degree—just generally, now. A. I have suffered from weakness as much as anything else. It was necessary that somebody stay with me most all the time. I can't sleep of a night. Six hours is all I have got since my leg was broken. Q. What do you mean? A. I will go to sleep and sleep maybe one or two hours. Q. Has your leg and hip hurt you since then? A. Yes. Q. Does it do that now? A. Not at the present moment. Q. Does it from day to day? A. Yes, from day to day. . . . Q. You have a crutch and cane? A. Yes. Q. Can you get around any other way? A. No. Q. Have you ever been able to get around any other way than you do since the accident? A. No. Q. Can you walk without a crutch? A. No. Q. Can you walk without your cane? A. No." The trial was October 24, 1942.

The rule of law applicable to an assignment on an excessive verdict is the same as that applicable to an assignment that the evidence is not sufficient to support the verdict for the plaintiff. All the evidence and reasonable inferences in favor of the verdict are presumed to be true. Peterson v. Kansas City, 324 Mo. 454, 23 S. W. (2d) 1045, l. c. 1048; Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S. W. (2d) 27, l. c. 30.

"One of the most difficult tasks required to be performed by an appellate court is the determination of the justness of a verdict in an action for a tort", Span v. Jackson, Walker Coal & Mining Co., 322 Mo. 158, 16 S. W. (2d) 190, l. c. 203. This task, and task it is, recurs frequently, but rules have grown up which are helpful in the disposition of such question. One of these rules is that "when the facts as to the injuries and losses sustained are similar . . . there should be a reasonable uniformity as to the amount of verdicts." O'Brien v. Rindskopf et al., 334 Mo. 1233, 70 S. W. (2d) 1085, l. c. 1093; Murphy v. Fred Wolferman, Inc., 347 Mo. 634, 148 S. W. (2d) 481, l. c. 489; Lynch v. Baldwin (Mo. Sup.), 117 S. W. (2d)

273, l. c. 278. Opinion in O'Brien v. Vandalia Bus Lines, Inc., 351 Mo. 500, 173 S. W. (2d) 76, is handed down herewith. In the O'Brien case the plaintiff was 43 years old and his earnings [90] were $190 per month, or $2280 annually. In the present case, plaintiff was 56 years old when injured, and his annual earnings for the last several years were in excess of $2050, and for 1940 (he was injured December 20, 1940), his earnings were $2210.17, and the injury similar to the injury in the O'Brien case, which was a comminuted fracture at the junction of the upper and middle third of the right femur, and while in the hospital phlebitis developed in the left leg, right elbow, shoulder and neck. A verdict for $15,000 was reduced to $12,500. If the rule of uniformity is followed, we think the present verdict of $15,000 is excessive in the sum of $2500. O'Brien v. Vandalia Bus Lines, Inc., supra; Johnson v. Chicago & E. I. Ry. Co., 334 Mo. 22, 64 S. W. (2d) 674; Mitchell v. Wabash Ry. Co., 334 Mo. 926, 69 S. W. (2d) 286; Evens v. Terminal R. Assn. (Mo. Sup.), 69 S. W. (2d) 979.

If plaintiff will, within 10 days from the filing of this opinion, file here a remittitur of $2500, the judgment for $12,500 will be affirmed, otherwise the judgment will be reversed and the cause remanded. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.