Debbe Augustine GOFF, Respondent,

v.

ST. LUKE'S HOSPITAL OF KANSAS
CITY and T. Crouch, M.D.,
Appellants.

No. 69604.

Supreme Court of Missouri,
En Banc.

May 17, 1988.

Rehearing Denied June 14, 1988.

B.W. Jacob, Jr., Robert C. Haldiman, Kansas City, for T. Crouch.

Kevin E. Glynn, William J. DeBauche, Appellate Counsel, Kansas City, for St. Luke's Hosp. of Kansas City.

Gordon W. Myerson, Kansas City, John Lewis, Springfield, for Debbe Goff.

BLACKMAR, Judge.

The plaintiff brought suit against St. Luke's Hospital of Kansas City and against Thomas T. Crouch, M.D., for the wrongful death of her husband, Gary Augustine. The jury returned a verdict against both defendants for $2,000,000. Neither defendant challenges the amount of the verdict, and neither asked for an apportionment of fault. The court of appeals reversed and remanded as to both defendants, for different reasons. We granted transfer and, taking the case as on initial appeal, affirm as to the hospital but reverse and remand as to the doctor. We state the facts that the jury could have found in support of the plaintiff's claim.

Gary Augustine was 29 years old at the time of his death on July 21, 1980. He had

apparently enjoyed good health until sometime in 1979, when he lost his kidney function by reason of glomerulonephritis. His physician in Springfield initially prescribed a regimen of home dialysis, but then a kidney transplant was sought in the hope of a more durable solution. A cadaver kidney became available and on June 26, 1980 the transplant surgery was performed at St. Luke's, which is a designated kidney transplant center. The transplant was apparently successful, but the implanted kidney was rather quickly rejected and was removed on July 8, 1980 at St. Luke's. Gary remained at the hospital and, because he had no functioning kidney, resumed dialysis three times weekly.

During the week beginning Monday, July 14, some problems appeared. There was a low grade fever and a decline in the hematocrit, which measures the percentage of red cells in a person's blood. The normal hematocrit reading is 45. A kidney patient usually has a lower hematocrit, but could adapt, if the reading does not become too low. Red cells are essential to carry oxygen from the lungs to the tissues and to maintain other important metabolic functions. A patient's hematocrit may decline either because of a loss of red cells or because the body is not manufacturing red cells. A decline is more significant in an anemic patient (one whose supply of red cells is already low) than in one in the normal range, because there is no reserve to fall back on. A hematocrit reading of 20 marks a critical point, recognized by the hospital's procedural manual, and is starred in hospital charts to call the abnormality to the attention of readers.[1]

Gary's hematocrit was in the low twenties when he entered St. Luke's. This is not unusual for renal patients. Following the removal of the transplant it dropped to 19 and then, on July 14, to 18. The next test was taken on Saturday, July 19, yielding a reading of 16. The plaintiff's experts were of the opinion that the drop to 16 was a medically significant event which should have had the attention of a physician. They indicated that, at the very least, preparations should have been made to give blood over the weekend, or during the dialysis scheduled for Monday. Prior to dialysis, however, nothing was done and Gary's physician was not notified. On Monday another hematocrit was taken, before dialysis had begun, and the reading was 10. The drop from 16 to 10 was very significant.

Dialysis began at 11:30 on July 21. Gary was seen during dialysis by Dr. Janardana Sharma, a nephrologist who shared responsibility with the defendant Crouch as his attending physician. Their detailed relationship is described more fully in Part I of this opinion. The time of Sharma's visit is not pinpointed but was during the early portion of the dialysis. He returned to his office across the street at 1:30 PM and did not again see Gary alive. When he was made aware of the hematocrit reading of 10, after his return to the office, Sharma issued orders to "type and cross LPPC's [2] today on dialysis" and, later to "give two units LPPC's when ready." The jury could reasonably have found this to be an order to give the blood while Gary remained on dialysis, when the mechanical procedures are easier and faster. Sharma's order did not indicate that there was any urgency, although he could have used conventional notations to call for immediate action.[3] Blood as ordered had arrived from the community blood center by 3:15 P.M., and was then available for cross matching to determine compatibility. At this time Gary was still on dialysis.

While dialysis was in progress other disturbing symptoms appeared. Gary complained of back pain, which is often a symp-

---

1. St. Luke's "Hematology Procedure Manual," introduced as evidence, listed "critical values requiring notification of pathologists, clinicians and/or nursing stations." The critical hematocrit level was "less than 20 per cent."

2. LPPC's stands for Leukocyte Poor Packed Cells. This is blood in which the white cells have been removed, leaving only the oxygen carrying red cells.

3. STAT is the hospital's code word for immediately. ASAP (as soon as possible) connotes less urgency. "When ready," the convention used, means sometime during the day.

tom of severe anemia. His blood pressure dropped to 80 over 40, an alarmingly low figure, and his pulse rate rose substantially, indicating that the body was attempting to compensate for the paucity of red cells. Saline solution was administered to raise the blood pressure and had some effect, but this also operated to further dilute the red cell component. The readings were reported to Dr. Sharma at a time not pinpointed in the record, and he may have directed that Gary be taken off dialysis. The dialysis, in any event, was terminated and Gary was returned to his room without having received the blood. The jury was not obliged to conclude that this return was at the direction of Dr. Sharma.

Subsequent events need not be described in detail. A resident physician saw Gary outside his room at 4:40 PM and directed that the blood be administered STAT. Administration of the blood in Gary's room did not begin until 5:30 P.M. Five minutes later a "code blue" emergency was called, indicating a life-threatening situation. Despite efforts of several doctors, Gary died about two hours later.

## I. Dr. Crouch's Liability

The case against Dr. Crouch is unusual in that there is no claim that he was negligent in any respect. The plaintiff seeks to hold him liable solely on account of his professional relationship with Dr. Sharma. Crouch does not challenge the jury's finding that Sharma was negligent.

Crouch and Sharma are board certified nephrologists. The speciality of nephrology has to do with functions and diseases of the kidney. They were stockholders and employees of a professional corporation organized under Chapter 356, RSMo, and were the only nephrologists then affiliated with that professional corporation.

They were also the only nephrologists then affiliated with the kidney transplant center at St. Luke's. Arrangements for Gary's care and treatment were made through the transplant center and not through the office of the professional corporation, which is across the street. Crouch and Sharma, however, were not employees of the hospital or of the transplant center. Their services are billed by their professional corporation. Crouch and Sharma were responsible for the medical aspects of the patient's problems, including monitoring of the kidney function following transplant surgery and, of course, for the resumption of dialysis following rejection and removal of the transplant. They are not surgeons. The surgery involved in the transplant and removal of the kidney was performed by a surgeon associated with the transplant center.

The hospital records show Dr. Crouch as the admitting physician. The plaintiff testified as to her understanding that he was the nephrologist in charge of Gary's care and treatment, although their initial visit, long before the transplant, was with Dr. Sharma because Crouch was out of town. Sometimes Crouch would visit Gary during his hospital stay and sometimes Sharma would. There is no evidence that the professional corporation arrangement was discussed with Gary or with the plaintiff at any time, or that Gary considered that he had retained the services of the professional corporation. On Monday, July 14, 1980 Dr. Crouch left town on a vacation. After that time Dr. Sharma was the only nephrologist attending Gary. Crouch left no orders or directions for Dr. Sharma, who was in complete charge of the medical aspects of Gary's case so long as Crouch remained away.

■ The case against Dr. Crouch was submitted by an instruction reading as follows: [4]

Your verdict must be for plaintiff against defendant, Thomas T. Crouch, M.D., if you believe:

First, Doctor Janardana Sharma was acting within the scope and course of his agency for defendant, Thomas T. Crouch, M.D., during Gary L. Augustine's admis-

---

4. The instruction cites M.A.I. 21.01 (1965 New), M.A.I. 20.02 (1983 Revision), M.A.I. 19.01 (1981 Revision), M.A.I. 18.01 (1965 New).

sion and treatment at St. Luke's Hospital of Kansas City, and

Second, plaintiff was the spouse of Gary L. Augustine, and

Third, either Doctor Janardana Sharma failed to timely order blood, or

failed to see that blood was timely given, or

failed to adequately monitor the lab reports of Gary Augustine's blood, and

Fourth, Doctor Janardana Sharma, in any one or more of the respects submitted in paragraph Third was thereby negligent, and

Fifth, such negligence directly caused or directly contributed to cause the death of Gary L. Augustine.

"Scope and course of agency" was defined as follows:[5]

Acts were within the "scope and course of agency" as that phrase is used in Instruction No. 10 if:

1. they were performed by Doctor Janardana Sharma to serve the interests of Thomas T. Crouch, M.D. according to an express or implied agreement with Thomas T. Crouch, M.D., and

2. Thomas T. Crouch, M.D. either controlled or had the right to control the physical conduct of Doctor Janardana Sharma.

This agency submission is inappropriate under the evidence. There is no showing that Crouch "controlled or had the right to control" Sharma in the performance of his professional duties. The record, rather, showed that Crouch and Sharma shared responsibility for Gary's care and treatment. While Sharma was present and Crouch was not, Crouch could not give directions to Sharma and had no right of control. The submission on the basis of the two instructions just quoted, then, lacks evidentiary support and reversal is required.

Crouch argues that the evidence demonstrates no legal theory for holding him liable for Sharma's negligence. He points to their status as employees of a professional corporation, suggesting that the corporation may be vicariously liable but that shareholders not participating in the negligent act are not. Section 356.150, RSMo 1978, which was in effect at the time of Gary's treatment,[6] reads as follows:

This chapter shall not affect any law, duty, right or privilege arising out of or applicable to the relationship between a person rendering professional services and a person receiving those services, including, but not limited to, liability or privilege arising out of the professional services....

■ The plaintiff argues that Crouch is liable because he and Sharma were jointly involved in Gary's care and treatment, citing *Baird v. National Health Foundation,* 235 Mo.App. 594, 144 S.W.2d 850 (1940) and, particularly, *Crump v. Piper,* 425 S.W.2d 924, (Mo.1968). Numerous other cases involving the treatment of a patient by more than one physician are cited. The closest cases are those on which the elements of partnership or joint venture, which is a form of partnership, appear. A physician may be liable for the malpractice of his partner within the scope of the partnership's professional activity, even though not personally present or at fault.[7]

■ We do not need to decide what the situation would be if the patient had been advised that Crouch and Sharma were employees of a professional corporation and were treating Gary in this capacity. The evidence as to what was made manifest to the patient is scanty. Gary was admitted through the "kidney transplant clinic" and not through the office of the professional corporation. It is the sense of the statute

---

**5.** The instruction cites M.A.I. 13.06 (1978 Revision).

**6.** This statutory provision has been repealed, and replaced to some extent by § 356.171.1, RSMo 1986, which might appear to limit liability to the professional person rendering the service. Our decision is not authoritative for cases

arising after the effective date of the amended statute.

**7.** In addition to *Crump v. Piper, supra,* and *Baird v. National Health Foundation, supra, see generally, Reed v. Sale Memorial Hosp. & Clinic,* 698 S.W.2d 931 (Mo.App.1985); 70 C.J.S. *Physicians & Surgeons,* 54.

then in force that the physician-patient relationship is a personal one, in spite of the professional corporation arrangement, which has its origin in tax considerations. The jury could find that the patient understood that the two nephrologists, Crouch and Sharma, were jointly responsible for his medical care. Malpractice claims have aspects both of tort and of contract law.[8] The patient's understanding is of great importance.

We conclude that the action against Dr. Crouch should be reversed and remanded for further proceedings. We cannot fully anticipate the issues that might be developed on remand, or the additional evidence that might be offered pursuant to the holding of this opinion, and so will not comment further. Nor do we express any conclusion about comparable situations under the statute now in force.

## II. The Hospital's Liability

The hospital argues that the plaintiff did not make a submissible case against it. It asserts, appropriately, that it does not practice medicine and that everything its employees did was consistent with the instructions of Dr. Sharma. It also asserts error in the verdict director and other trial error. We conclude that none of the errors claimed is established.

### A. The Evidence of Negligence

■ The defendant hospital argues that there is no evidence that it was negligent. The point can best be considered in the light of the plaintiff's verdict director against the hospital, which reads as follows:[9]

Your verdict must be for Plaintiff and against defendant St. Luke's Hospital of Kansas City if you believe:

First, plaintiff was the spouse of Gary L. Augustine, and

Second, the employees of St. Luke's Hospital of Kansas City were acting within the scope and course of their employment by St. Luke's Hospital of Kansas City during Gary L. Augustine's admission and treatment at St. Luke's Hospital of Kansas City, and

Third, defendant's employees failed to follow its critical values of blood policy and procedure, or

failed to adequately monitor the lab reports of Gary L. Augustine's blood, or

failed to timely order blood, or

failed to see that blood was timely given.

Fourth, defendant St. Luke's Hospital of Kansas City, in any one or more of the respects submitted in paragraph Second was thereby negligent, and

Fifth, such negligence directly caused or directly contributed to cause the death of Gary L. Augustine.

There is prejudicial error, of course, unless all four of the alternatives set forth in paragraph Third are supported by substantial evidence. We conclude that they are so supported.

On Saturday morning, July 19, the hospital's employees became aware of the hematocrit reading of 16, which is well below the hospital's critical values. According to the plaintiff's experts, in the exercise of due care, a resident physician should have made arrangements to give blood sometime during the weekend, or, at the very least, to report the low reading to Dr. Sharma as the attending physician, in which case the hospital might be able to leave decisions to him. There is no evidence of any such report, and no indication that Sharma saw the patient on Saturday or Sunday. There was support then, for findings of "failure to follow its critical values of blood policy and procedure" and of failure "to adequately monitor the lab reports." It is not necessary to point to any particular employee of the hospital as the person at fault, any more than it is necessary to decide which employee of a supermarket should have noticed a dangerous condition which is shown to have existed for a sub-

---

8. *See generally,* 70 C.J.S. Physicians & Surgeons 64(a) pp. 458–459.

9. The instruction cites M.A.I. 20.02 (1983 Revision) Modified, M.A.I. 19.01 (1981) Revision, M.A.I. 18.01 (1965 New).

stantial time.[10] If a physician noticed the reading he or she should have taken action; if not, the hospital employees should have reported it to someone qualified to make decisions. The jury might also find a failure on the hospital's part to give prompt and proper attention to the Monday reading of 10.

The record also supports a conclusion that the hospital "failed to timely order blood." The record shows that resident physicians had the authority to order blood over the weekend and to cause it to be administered. If it were felt that blood should not have been administered without Dr. Sharma's approval, he could have been notified. Another possibility would be to order suitable blood to be available Monday morning, when Gary was next scheduled for dialysis. Blood is sometimes ordered so that it will be available if needed, even though it is not certain that it will be given. The jury might also believe that the hospital employees did not proceed so quickly as they should have after Dr. Sharma gave the blood order on July 21. The hospital employees knew how long the dialysis was expected to continue, and could have advised the blood bank that blood was needed in time to meet this schedule. They cannot excuse themselves by asserting that Dr. Sharma gave no STAT or ASAP order. They knew when the blood would be needed in order to carry out his orders.

There is also evidence that the hospital "failed to see that blood was promptly given." In addition to the delay over the weekend, the jury could also find the hospital at fault for the delay of more than two hours from the arrival of the blood to the beginning of the transfusion. Blood can be given much more efficiently during dialysis, yet the patient was returned to his room. The jury did not have to find that Dr. Sharma ordered the return. It might expect the hospital to explain why blood received at 3:15 was not administered until 5:30 P.M. The plaintiff's expert testimony indicated that every hour was important, especially after the hematocrit dropped to 10 Monday morning.

The four particulars of negligence contained in the verdict director, then, are supported by the evidence. It follows that the plaintiff made a submissible case of negligence. To so hold does not make the hospital responsible for practicing medicine. Nor does it require the hospital residents or other employees to second guess the attending physician. The negligence asserted relates to the hospital's duty to provide care for the patient, and to carry out physicians' orders. We must remember that the patient is in the hospital constantly, while the attending physician sees him only briefly. Hospital employees, whether or not physicians, may be called upon to exercise judgment not inconsistent with the physician's orders, when the attending physician is not present or available. The jury could have found several instances in which prompt action by the hospital employees would have made the blood available sooner.

■■■ The hospital also argues that the plaintiff has failed to establish causation. Its basic claim is that Gary died of a septicaemia, as shown by the autopsy finding of staphylococci in the blood, and that the low red cell content was not a contributing factor.[11] The plaintiff's experts concede the possibility of such an infection, but are positive in saying that the anemic condition, as evidenced by the constant decline in the hematocrit, contributed to the patient's death. The only way to raise the hematocrit quickly is to give blood. Time was of the essence. One witness said that the lack of red cells was "a major cause of death." The test of causation is met. *Jackson v. Ray Kruse Const. Co.*, 708 S.W.2d 664, 669 n. 6 (Mo. banc 1986). The issue is for the jury. We also reject the hospital's claim that the cross-examination ·

10. *E.g., Brown v. Kroger Co.*, 344 S.W.2d 80, 84 (Mo.1961).

11. The evidence of septicaemic infection was not conclusive. No blood culture taken while the patient was alive showed bacterial infesta-tion. There was a delay in taking the post-mortem specimen and one witness suggested that the bacteria might have proliferated after death in the blood, which is an excellent culture medium.

rendered the expert testimony so uncertain that it could not support the essential findings. The cross-examination merely raised questions for the jury to evaluate, in the context of the entire record. *Goslin v. Kurn,* 351 Mo. 395, 173 S.W.2d 79, 87 (1943).

## B. Trial Error

The defendant hospital has two additional criticisms of the verdict director against it as quoted above. The conjunction, "and" is omitted between paragraph Third and paragraph Fourth, with a period rather than a comma at the end of paragraph Third. Then paragraph Fourth refers to negligence in the respects submitted in paragraph *Second,* whereas the particulars of negligence are submitted in paragraph Third. Only the first of these complaints is challenged in the motion for new trial, Item 20 of which reads as follows:

The court erred in submitting plaintiff's verdict directing Instruction No. 8 against St. Luke's Hospital since the verdict director erroneously eliminated the conjunctive "and" at the end of the third proposition of Instruction No. 8 and before the fourth proposition of Instruction No. 8, in direct violation of M.A.I. 20.20.

Rule 70.03 of our rules reads as follows:

Counsel need not object to any instructions to be given at the request of any other party or by the court on its own motion or to the refusal of any instructions requested by such party. Specific objections to instructions shall be required in motions for new trial unless made at trial. The making of objections during trial shall not preclude making additional objections to the same or other instructions in the motion for new trial. No general objection to instructions is required.

The hospital has preserved only the failure to insert the conjunction, "and." The complaint about the mix-up in paragraphs was not mentioned in the new trial motion. By Rule 70.02(c) the deviation from MAI is error, but we are required to determine whether the omission of "and" was preju-

dicial. The governing rule is Rule 84.13(b) reading as follows:

**Materiality of Error.** No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action.

We conclude that the omission of "and" was not prejudicial. Paragraph Third contains four hypotheses in the disjunctive, separated by "or." It is difficult to see how any literate juror could conclude that the jury did not have to find the facts submitted in paragraph Fourth, in addition to one of the alternate submissions of paragraph Third. There is no ground for confusion. *Cf., Lee v. Mirbaha,* 722 S.W.2d 80, 84 (Mo. banc 1986) (finding no prejudicial error in the use of "these" in converse instructions, when the appropriate and responsive word would have been "this.")

In *Kirkendall v. Townsend,* 559 S.W.2d 561 (Mo.App.1977), the court was confronted with an instruction in which the "and" had been omitted between all paragraphs of a verdict directing instruction. The trial court had granted a new trial on this basis, and the court of appeals affirmed. The holding is appropriate because the judgment of the trial court on matters of prejudicial error is entitled to great weight. Here the trial court overruled the motion for new trial, and so our holding is entirely consistent with *Kirkendall.* Even so, the *Kirkendall* opinion expresses dissatisfaction with a situation in which the least typographical error would mandate a new trial.

The defendants cite *Brown v. St. Louis Public Service Company,* 421 S.W.2d 255 (Mo. banc 1967), for the proposition that any deviation from the MAI patterns requires reversal unless "it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation." The case is distinguishable for several reasons. In the first place, it was directed toward attempts at deliberate deviation from, or attempted "improvement" of, MAI Instructions, in order to make it clear to the bar that counsel should

not substitute variations of their own for the MAI text. The opinion expressly disclaims any intention of holding that all typos or inadvertent variances require reversal. Secondly, the trial court in that case granted a new trial because of the deviation from the patterns, and so the proponent of the instruction had the burden of demonstrating error on appeal. Third, we sense no purpose in that opinion of departing from the long-established proposition of Rule 84.13(b), quoted above.[12] *Brown* does not require reversal in this case.

■ The defendant hospital, in its argument to the jury, clearly stated that the plaintiff had to establish each of the five propositions set forth in the verdict director. The plaintiff squarely took on each of the alternatives of paragraph Third, and argued that the record demonstrated negligence in each of these respects. It is proper to consider counsels' arguments in determining prejudicial error. *Welch v. Hyatt*, 578 S.W.2d 905, 914 (Mo. banc 1979). We are not persuaded that we should reverse the trial court for the reason assigned.

■ Nor do we find plain error in the confusion between paragraph Second and paragraph Third. We may raise an eyebrow at the lack of careful proofreading in a case of this importance, but we cannot say that the jury was misled as to the issues it was required to decide. Because of the failure of preservation we do not have the benefit of the trial judge's views, and we decline to reverse him.

Failure of the defendant hospital to object before the instructions were given to the jury plays no part in our decision. We have reviewed the error preserved and find

it not to be prejudicial. This is in line with other recent cases, in which the appellate courts give great deference to the conclusion of the trial judge as to the prejudicial effect of errors in instruction,[13] and are reluctant to reverse for error which does not give indication of prejudice.[14] It is nevertheless appropriate to observe that a lawyer who finds something in his opponent's instruction which may adversely affect presentation to the jury may speak up at the time, in an effort to obtain the best legal submission for his client. The lawyer who does not do so is not doing his best to win the case before the jury, but rather is thinking of appeal before the verdict is in. The lawyer who remains silent is entitled to review under Rule 70.03, but is not entitled to reversal unless prejudice is established. This is the teaching of our recent cases.[15]

The plaintiff was allowed to read in evidence portions of the deposition of Donna Cling, a nurse employed by St. Luke's as "supervisor of incenter dialysis". St. Luke's objected on the ground that the plaintiff had not shown that she was unavailable as required by Rule 57.07(a)(3). The plaintiff countered with the argument that Cling's statements could be received as admissions of St. Luke's because of her supervisory position. The trial court overruled the objection. The court of appeals found error sufficient to require reversal.

■ We agree that there was error but do not discern prejudice. Even though the witness had an important supervisory position she was not a managerial person whose statements constitute admissions by her employer,[16] nor was she acting within the scope of her employment when she

---

12. Rule 84.13(b) is derived from 512.160.2, RSMo 1986 (L.1943, p. 353, sec. 140).

13. *See, Brickner v. Normandy Osteopathic Hospital, Inc.,* 687 S.W.2d 910 (Mo.App.1985), and *Abshire v. Nordsen Corp.,* 688 S.W.2d 1 (Mo.App. 1985), in which the respective trial courts reached apparently conflicting results on whether instructional error required reversal. Both cases were affirmed by the court of appeals, and we denied transfer, deferring to the trial judge's discretion in measuring prejudice.

14. *Cornell v. Texaco, Inc.,* 712 S.W.2d 680, 682 (Mo. banc 1986); *Lawton v. Jewish Hospital of St. Louis,* 679 S.W.2d 370, 374–75 (Mo.App. 1985).

15. *Cornell v. Texaco, Inc.,* 712 S.W.2d 680 (Mo. banc 1986); *Hudson v. Carr,* 668 S.W.2d 68 (Mo. banc 1984); *Fowler v. Park Corporation,* 673 S.W.2d 749 (Mo. banc 1984).

16. *Cf., Brown v. Kroger Co.,* 344 S.W.2d 80 (Mo. 1961); Rule 57.07(a)(2).

made the statement.[17] She testified on deposition at the instance of the plaintiff and not as an officer of the hospital.[18] She is not shown to have participated in Gary's care. Testimony in open court remains the rule and deposition testimony the exception, requiring a showing of unavailability.

■ But error does not necessarily require reversal. Prejudice must appear. Rule 84.13(b). The deposition testimony was given under oath, with all parties having the right to full examination. The witness said, essentially, that she would report a hematocrit reading which was below 20 to the responsible physicians, and that with a reading of 18 or 16 blood would probably be given. This is consistent with St. Luke's procedural manual received in evidence. St. Luke's did not express disagreement and did not call any witness to challenge the testimony. There is no reason to assume that Cling's testimony in open court would have differed from the deposition testimony. Under these circumstances, prejudice to St. Luke's is not apparent.

■ St. Luke's argues that the trial judge compounded the error when he would not allow it to read other portions of Cling's deposition during its case. The trial court's ruling is consistent with his major premise that the plaintiff could read portions of the depositions as admissions. If this were correct, the defendant had no right to read additional portions as substantive evidence. As we have held, however, the trial judge's assumption was not correct, and St. Luke's had as much right to read from the deposition as the plaintiff did. St. Luke's is not entitled to reversal, however, because it made no offer of proof as to the additional portions of the deposition which it wanted to read.[19] The offer, pointing up the contention of prejudice, is an essential condition of relief at the appellate level. St. Luke's could also have made an effort to bring the witness in and, if she were unavailable, could then read from the deposition. But it made no attempt to follow this course of action, possibly through fear of condoning the error previously asserted. A party confronted with an erroneous ruling may be expected to take reasonable steps to blunt the effect.

■ St. Luke's also objects to the trial court's refusal to allow it to present Dr. Thomas Wiegmann as an additional expert witness. The initial order of denial was entered when the trial was scheduled to go forward on October 28, 1985, and the proposed witness had not been listed until October 21. Then there was a postponement until January 21, 1986. St. Luke's argues that there was a sufficient change of circumstances so that it should not be denied the additional expert witness testimony it desired. Although the trial court has great discretion in maintaining the integrity of discovery in prior pretrial proceedings, it should hesitate to deny a party the right to important testimony. St. Luke's, however, has failed to point out on the record of the trial court, and to us, the testimony it expected from Dr. Wiegmann. Its supplemental answers to interrogatories, filed October 21, 1985, indicate only the areas to be covered and do not indicate disagreements with the plaintiff's experts. No further offer was made at trial. We are unable to determine how it was harmed by the denial. This relieves us of determining whether the trial court abused its discretion.

The judgment against St. Luke's Hospital is affirmed. The judgment against Dr. Crouch is reversed and the case is remanded for such further proceedings as may be indicated.

BILLINGS, C.J. and HIGGINS, J., concur.

ROBERTSON, J., concurs in result.

DONNELLY, J., dissents in separate opinion filed.

17. *See,* e.g., *Roush v. Alkire Truck Lines,* 299 S.W.2d 518 (Mo.1957), *Missouri State Highway Commission v. Howard Construction Co.,* 612 S.W.2d 23, 26 (Mo.App.1981).

18. *Cf., Annin v. Bi–State Development Agency,* 657 S.W.2d 382 (Mo.App.1983).

19. E.g., *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203 (Mo. banc 1983).

WELLIVER and RENDLEN, JJ., · dissent and concur in separate dissenting opinion of DONNELLY, J.

DONNELLY, Judge, dissenting.

In *Brown v. St. Louis Public Service Company*, 421 S.W.2d 255, 259 (1967), this Court held that "where there is deviation from an applicable MAI instruction which does not need modification under the facts in the particular case, prejudicial error will be presumed unless it is made perfectly clear by the proponent of the instruction that no prejudice could have resulted from such deviation."

The rationale for the *Brown* holding was articulated by Judge Ben W. Swofford in *McGowan v. Hoffman*, 609 S.W.2d 160, 163 (Mo.App.1980):

The Supreme Court of this state with laudable intent and worthy and efficient aspiration adopted MAI and ruled so as to enforce upon the bench and bar a very strict code of restriction by and compliance with its mandatory use, all of which has effected a vast savings in judicial time and taxpayers' money. But the gate of restriction and compliance must in the interest of fundamental justice be left somewhat ajar. Thus, from the consistent and binding decisional law, since the adoption of MAI and Rule 70.02, the principle has evolved that courts faced with violations or impermissible modifications of MAI must gauge the prejudicial effect thereof. Such defect in submission of a case must be shown to be non-prejudicial before it can be given. It appears to this Court that it must be shown, and the judicial mind and conscience satisfied by means of some positive force of fact or logic, that no "prejudicial effect" has resulted from the erroneous instruction. The burden to make this showing rests upon the party offering the instruction.

In *Hudson v. Carr*, 668 S.W.2d 68 (Mo. banc 1984), an instruction on damages, taken from MAI *without change*, was given in behalf of plaintiff. Defendant asserted on appeal that under the evidence the MAI instruction *should have been modified.* The Court held, *in such circumstance,* that "when the instruction is only abstractly erroneous there is a need for balancing and balancing in this instance indicates that a new trial is not necessary." *Hudson v. Carr*, 668 S.W.2d at 72.

In *Fowler v. Park Corp.*, 673 S.W.2d 749, 756 (Mo. banc 1984), the wrong MAI instruction on standard of care was given in behalf of plaintiff and the Court, without mentioning *Brown*, placed the burden of demonstrating prejudice on the party *opposing* the instruction and held "that we should reverse only for defects of substance with substantial potential for prejudicial effect."

It must be said that *Fowler* was an unwarranted and unwise extension of *Hudson*. *See Points v. Dzur*, 713 S.W.2d 634 (Mo.App.1986); *Abshire v. Nordson Corp.*, 688 S.W.2d 1, 2 (Mo.App.1985) (Stewart, J., dissenting); McCarter and Behr, *MAI Error After Fowler v. Park Corp.: Prejudicial or Not?*, 41 J. of Mo. Bar 308 (July–August 1985). But *Fowler* remains intact.

I dissent.