**Alice M. SCHMIDT, Plaintiff-Respondent,**

v.

**Robert J. SCHMIDT, Defendant-Appellant.**

**No. KCD 30565.**

Missouri Court of Appeals, Western District.

Dec. 3, 1979.

Douglas A. Dowell, Independence, for defendant-appellant.

Richard J. Southall, Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

The present case is an appeal from an order of the Circuit Court of Jackson County changing the custody of 11-year-old Victoria Lynn Schmidt from her father, Robert J. Schmidt, to her mother, Alice M. Urena. The order of the court also fixed child support payable by the father to the mother at $150 per month, and provided for visitation to the father. The hearing was held October 2, 1978, and the order was entered that day.

Robert and Alice were divorced October 15, 1973, and Victoria Lynn's custody was given to her mother at that time. Then in the spring of 1975 Alice was suffering from a period of depression, connected with alcoholism, and Victoria Lynn's custody was transferred to Robert upon his motion to modify. That modification was not contested by Alice and the order was entered on June 10, 1975. More of that modification later.

On November 18, 1976, Alice married Richard Urena, a retired, partially disabled former member of the United States Marine Corps. He was 46 years old at trial time. Mr. Urena had an 11-year-old son by a previous marriage who lived with him and Alice. He received retirement and disability pay which totals approximately $840 a month.

About three weeks before the trial, Alice and Mr. Urena, along with David, had moved to a 20-acre tract near El Dorado Springs, Missouri, where they had some hogs and chickens. Alice was not employed outside the home and intended to spend full time at home. Mr. Urena expected to devote his full time to the operation of the farm. El Dorado Springs is 100 miles from Kansas City.

They had a six-room house on the farm, where Vickie, if she came to live with them, would have her own bedroom. It had modern facilities. She would attend the El Dorado Springs public schools. Alice said the school system had a Triple-A rating. Vickie would be transported to school, a distance of eight miles, by the school bus.

Before moving to the farm, Mr. Urena and Alice had operated a bar in Kansas City, Kansas. Alice had worked full time in the bar. They had sold the bar and had nothing further to do with it. The proceeds from the sale of the bar were used to purchase the farm. They had paid $6,000 down and owed between $18,000 and $19,000 on the farm, payable in monthly payments of $200.

Although the Urenas had no church affiliation, they had been attending a Church of God located near the farm, Alice said. She also said she would take Vickie to the Catholic Church at El Dorado Springs on Sunday "if she wanted to continue to go to the Catholic Church".

Alice testified that she had had an alcohol problem. She had gone through an alcoholic center in January of 1978, and had not been intoxicated since that time. Until a time about three months before the trial, she had been on Antibuse. She had also attended Alcoholics Anonymous meetings, although not since their move to El Dorado Springs. She had gone at some time to a marriage counselor because of the strain her drinking was putting on her relationship with Mr. Urena. Alice is 41.

Mr. Schmidt lived in Independence, Missouri, with his parents. He worked for General Motors in Leeds, a night shift, and his net earnings were a little over $250 per week. When he got Vickie's custody in 1975, her teeth were in bad condition and he had to spend $750 in dental costs for retainers. Robert took her to Girl Scouts, bowling, volley ball, skating, and to occasional shows of the Walt Disney variety. She was doing very well in school, although she had been doing poorly before the 1975 transfer. She attended Holy Family School in Independence. In caring for Vickie, Robert was assisted by his mother. During the previous summer—1978—Robert had built a swimming pool for Vickie, as a reward for her wearing the retainer on her teeth. Robert explained, "I felt that this would show her that doing the right thing she can have a few things".

Alice testified to some difficulties and frustrations in seeking to exercise her visitation rights. Some tension developed over the fact that Alice would take the child with her to the bar where she worked, a practice which Robert objected to. Vickie, in an in-camera conference with the court, said that on those occasions she would stay behind the counter—"nobody could get to me", Vickie said—or in a back room or in the bathroom. A second cause for disagreement was Alice's not getting Vickie off to church on Sunday mornings. Alice, according to Vickie's report to her father, would

sleep until noon and Vickie would miss church. At one time during the summer of 1978 a quarrel over this subject took place when Alice came to pick up Vickie for visitation. Robert undertook to deny permission for Vickie to accompany her mother, and he twisted Alice's arm. Vickie's tears caused him to yield and the visitation was permitted.

Both Robert and his mother testified that Alice was sporadic in her contacts with Vickie, sometimes going three or four weeks without calling or seeing her. Alice would sometimes call for visitation on short notice when Vickie had other plans, Robert said, and sometimes Vickie herself would fail to return her mother's calls. They insisted that they had not purposefully stymied Alice's visitation with Vickie.

Robert, as earlier stated, lived with his mother and father in a two-bedroom home. His parents occupied one bedroom and Vickie the other, while Robert slept in the basement. His mother was 67, his father 71. Both worked part-time outside the home, the mother at a convent and the father at St. Mary's School. His mother testified at the trial. She spoke of helping Vickie with her homework and of sponsoring a birthday party for her. Evidently the general management of the household fell to her.

Robert said that Vickie was doing well in school, and has a number of friends and has "all kind of girl friends". Nine of them had attended a birthday party for her on the day before the trial, and eight or nine were often at her house playing with her in the swimming pool.

Robert had taken Vickie for a series of conferences with "one of them places over here where they try to help the child balance out on the effect of a divorce situation". Each session included 30 minutes with Vickie and 30 minutes with Mr. Schmidt.

In a poignant in-camera conference between the trial judge and Vickie, only the court reporter being present, Vickie expressed a desire to live with her mother. In response to the court's question she said: "I think I should; I'm getting to the age where I needed my mother; and my grandma don't tell me too much . . . I want to live with my mom for a little while, because I have been living with my dad a lot. My dad doesn't want me to; he says I should be in school. She, like if I say I don't want to go to school, she says it's okay. She don't want me to stay with him for a little while. But I have been staying here since December 1st, four years; and I feel like I should be with my mom for a little while and—a couple of years and stay the summers with him . . . I have been down there (to the farm) before; and it's pretty neat . . . and I want to go with her for a little while. . . . I think I should get to live there a little while; I don't get to go there very much; I don't like that too much . . . I need a mother; you know what I mean?" The desire to live with her mother was repeated almost to the point of insistence.

The court order, as noted above, sustained the motion to modify and ordered primary custody of Vickie placed in her mother, Alice, and fixed child support payable by the father to the mother at $150 per month. Visitation to the father was set at two weekends per month during the months of September through May, and six weeks during the months of June through August.

■ The change of circumstances in this case do not justify the change of custody from the father to the mother. There is value in a child's being kept with the parent who now has custody, as against uprooting her and transplanting her in a new home. *Clouse v. Clouse*, 545 S.W.2d 402, 407–8 (Mo.App.1976); *Klaus v. Klaus*, 509 S.W.2d 479, 481 (Mo.App.1974). For that reason, the cases emphasize the need for a showing of a significant change of circumstances directly affecting the welfare of the child in order to justify a custody change. The change in circumstances must be such as to give definite promise that the custody change will benefit the child in a substantial way. *In re Marriage of Britton*, 574 S.W.2d 475 (Mo.App.1978); *Lickteig v. Goins*, 458 S.W.2d 596, 599 (Mo.App.1970).

The custody change now under review trades a proven stability and a seriously purposed, disciplined kind of child-rearing for an unknown and a dubious situation. The mother is an arrested alcoholic. Her still young marriage to Mr. Urena has suffered some strain. At trial time they were only a few weeks removed from the operation of a bar where the child had been kept by her mother a good many late hours behind the counter, in a back room or in the bathroom. There is evidence of an absence of parental discipline by the mother. According to Vickie, her mother says "it's okay" if she says she wants to miss school. She had missed 18 or 19 days of school during the year her father got custody changed from her mother, before the custody change. During that period, Alice and Vickie seem to have been living an· unsettled, pillar-to-post existence. While operating the bar, the mother would sleep till noon on Sunday, and Vickie would miss church. It raises questions about her taking Vickie to El Dorado Springs each Sunday, to the nearest Catholic Church, as she said she would do if she got her custody. The disposal of the bar and reestablishment in a rural setting may have changed all that, but it was too soon to tell at trial time. *Lickteig v. Goins, supra* at 600; *S___ v. G___,* 298 S.W.2d 67, 77 (Mo.App.1957); *Irvine v. Aust,* 193 S.W.2d 336, 341–2 (Mo. App.1946).

The father, on the other hand, with his parents' help, has worked with serious purpose at the task of rearing Vickie and meeting all her needs. Our statement of facts shows, and we do not need to repeat, the facts which support that conclusion.

Vickie's desire to live with her mother is entitled to some weight at age 11, but it is not decisive. *Engler v. Engler,* 455 S.W.2d 36, 41 (Mo.App.1970); *Graves v. Wooden,* 291 S.W.2d 665, 669 (Mo.App.1956). It seems to be based in part upon the novelty of the new farm situation and upon a less structured life under her mother. As she grows older, her desires may be accorded more weight.

The judgment is reversed and the cause remanded· for a new decree, which should provide for primary custody to remain in the father, with visitation to the mother one weekend each month and one month during the summer, with such other provisions as will serve the best interests of the child and, secondarily, the convenience of the parties. Provision will need to be made for the school holidays, transportation between El Dorado Springs and Kansas City and the like.

All concur.