**Lyn Marie (McClanahan) RANDEL, Appellant,**

v.

**Jack Owen McCLANAHAN, Respondent.**

**No. WD 40374.**

Missouri Court of Appeals, Western District.

Nov. 22, 1988.

Thomas E. Hankins, Gladstone, for appellant.

Douglass F. Noland, Kansas City, for respondent.

Before KENNEDY, C.J., and BERREY and FENNER, JJ.

FENNER, Judge.

This is an appeal from an order modifying a dissolution decree transferring custody of a minor child, Robert Owen McClanahan (Robby), from his mother, Lyn Marie Randel to his father, Jack Owen McClanahan.

The marriage of the parties was dissolved by the Circuit Court of Clay County on June 7, 1979. At the time of the dissolution, custody of the adopted son of the parties, Robby, was awarded to his mother whose name is now Lyn Marie Randel.

Jack McClanahan filed a motion to modify the dissolution decree on March 4, 1986, seeking to change custody of Robby. A

hearing was held on January 27th and 28th, 1988, at the conclusion of which the court entered its order changing custody of Robby from his mother to his father. Lyn Randel appeals the court's order arguing that the trial court erred in transferring custody of Robby because there was no demonstration that a change in circumstances of either Robby or herself had occurred that would justify a change of custody.

The review of this court tried case is governed by Rule 73.01 and the landmark decision of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). Therefore, upon review, the decision of the trial court must be sustained unless there is not substantial evidence to support the decision, it is against the weight of the evidence, or that it erroneously declares or applies the law. *Id.* at 32.

■ Inherent within review of court tried cases, the trial court has the prerogative to determine the credibility of witnesses; accepting or rejecting all, part or none of their testimony. *In re the Marriage of Scobee*, 667 S.W.2d 467, 468 (Mo.App.1984). When the trial court has received conflicting evidence, appellate courts should review the facts in the light most favorable to the trial court's order. *Trenton Trust Co. v. Western Surety Co.*, 599 S.W.2d 481, 483 (Mo. banc 1980); *In Interest of M.E.W.*, 729 S.W.2d 194, 196 (Mo. banc 1987). In reviewing the decision of a court tried case, the primary concern of the appellate court is the correctness of the result that is reached, and the lower court's judgment is to be affirmed if it is correct under any reasonable theory supported by all the evidence. *St. Louis County, Mo. v. Oakville Development*, 676 S.W.2d 919, 921 (Mo.App.1984).

Modification of a prior custody decree is controlled by Section 452.410, RSMo 1986, which states:

The court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

■ The record in this case reflects that substantial evidence existed for the trial court to conclude that a change of circumstances had arisen since the prior decree with respect to Robby and his mother and that a change in custody from the mother to the father was in Robby's best interest.

Jack McClanahan testified at trial that he knew of twenty different places Lyn Randel had lived since their divorce and that Robby had been in four or five different schools in the same period. Lyn Randel had been remarried and divorced twice since her divorce from Jack McClanahan. In one of her subsequent marriages Lyn Randel was physically abused by her then husband in the presence of Robby.

Jack McClanahan testified that Robby had been prone to crying "right out of the clear blue sky" for the past several years. Jack attributed this to Robby having problems with his mom "having several different boyfriends in and out, leaving him with babysitters all night long, and stuff like that." The crying was also noted by Jack's present wife, Laura. Jack testified that there was an instance where Robby wanted to learn karate because he wanted to beat up the man his mother was married to because he was beating her. Jack told of one time when he had to drop Robby off at the Roadway Inn Motel because his mother had separated from her husband at the time. Jack said that Robby was very upset and that Robby said "here we go again, she's going to do it to me again." Jack also said that when Robby would come to visit him Robby's clothes were shabby, his pants had the knees ripped out and were too short, and his shoes were too tight.

There was testimony before the trial court that Lyn Randel had been employed at over ten different places since the date of the dissolution of her marriage from Jack McClanahan and that she had only two jobs that she had been able to hold for over one year.

Jack McClanahan testified that his ex-wife Lyn blocked his efforts to keep up with Robby's progress in school. Robby has a learning disability and Jack testified that he and his present wife, Laura, have taken numerous steps to learn ways to approach learning disabled children and have made an effort to work with Robby when he is with them. Laura has taken an advanced learning disability class at St. Mary's College in Leavenworth, Kansas, to learn more about learning disability problems and how to work with them.

Robby was eleven years old at the time of the hearing and he expressed his desire to live with his father. Robby's wishes are not determinative, but they are a factor to be considered by the court. *Knoblauch v. Jones*, 613 S.W.2d 161, 167 (Mo.App.1981).

It is recognized by this court that child custody decisions are most often difficult decisions to make and rarely are they based upon unequivocal evidence of what is in the best interest of the child. Appellant's love for her son is not in dispute, but under the standard for review as set forth in *Murphy v. Carron, supra; In re the Marriage of Scobee, supra;* and *St. Louis County, Mo. v. Oakville Development, supra,* the judgment of the trial court is found to be based upon substantial evidence when accepting as true the evidence in support thereof and disregarding the contradictory evidence.

The judgment of the trial court is affirmed.

KENNEDY, C.J., concurs in separate opinion.

BERREY, J., dissents in separate opinion.

KENNEDY, Chief Judge, concurring.

I concur in Judge Fenner's opinion. I could as readily join in the affirmance of a judgment denying the change of custody, for reasons forcefully presented in Judge Berrey's eloquent polemic. But because of the trial judge's superior coign of vantage, we are required to defer to his decision if it does not run afoul of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

BERREY, Judge, dissenting.

I respectfully dissent.

The majority opinion fails to adequately address the issues presented by the evidence in this case and glosses over the real tragedy involved. By affirming the decision of the lower court, the majority opinion gives tacit approval to a judgment about the respective lifestyles of the appellant and the respondent, a judgment which mirrors the idealistic view of what a family is and ignores the reality. The change of custody made in the instant case also ignores the maxim that custody should not be used as a reward or punishment, but must be based upon the best interests of the child. *Bashore v. Bashore,* 685 S.W.2d 579 (Mo.App.1985). The majority also glosses over the fact that many of the events relied upon for the change of custody occurred years prior to the filing of the motion and that respondent did absolutely nothing, seemingly unconcerned about his son's welfare until now. His failure to act earlier may very well constitute a waiver or an estoppel. It is evident, however, that in the intervening years the appellant has proven herself to be a loving, caring, and dutiful parent. Not one scintilla of evidence was introduced bearing upon the here and now.

There is no magic formula which gives precise and certain rules to follow when making a determination on who prevails in a custody case. Every case is different, and must be examined in light of the facts and circumstances involved. *Betterton v. Betterton,* 752 S.W.2d 417 (Mo.App.1988). There are, however, certain general principles which are applicable when reviewing a case of this kind. The review of this court-tried case is governed by Rule 73.01 and the decision of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). Therefore, upon review, the decision of the trial court must be sustained unless there is not substantial evidence to support the decision, it is against the weight of the evidence, or that it erroneously declares or applies the law. *Id.* at 32. In the instant case, it is clear that there was not substantial evi-

dence upon which the trial court could base its ruling.

Modification of a prior custody decree may only be done in accordance with the provisions of section 452.410, RSMo 1986, which states:

[T]he court shall not modify a prior custody decree unless ... it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.

Where custody has once been adjudicated, it is presumed that the custodian of the child remains suitable. *In re Marriage of Harris,* 734 S.W.2d 304, 305 (Mo.App. 1987). The burden of proving that a change of circumstances has arisen necessitating a change in custody is on the party who is seeking that change. *In re Marriage of Thompson,* 682 S.W.2d 849, 850 (Mo.App.1984). These precepts are valuable tools for the examination of the custody issue in the present case.

Deference should be accorded the decision of the trial court and the presumptions are in favor of the trial court's order, which should not be lightly set aside. *In re Marriage of Scobee,* 667 S.W.2d 467 (Mo.App. 1984); *Henderson v. Henderson,* 622 S.W. 2d 7 (Mo.App.1981). On appeal, the findings of the trial court control, unless the appellate court is convinced that the welfare of the child requires that some other disposition be made. *Fastnacht v. Fastnacht,* 616 S.W.2d 98, 100 (Mo.App.1981). The record in this case cries out that another disposition should have been made and that custody should not have been changed.

Although not requested by the parties, the trial court made several general findings of fact. These general findings are nothing more than the judgment of the court and are governed upon review by the standards of *Murphy v. Carron, supra. See Adkins v. Hobson & Son, Inc.,* 666 S.W.2d 951, 954 (Mo.App.1984).

The trial court found:

That since the entry of the original Decree on June 7, 1979, there has been a substantial, material and continuing change of circumstances with respect to the custody of the minor child and the amount of support owing on behalf of the minor child, so as to make the original terms unreasonable:

A. That the Petitioner, since the date the Decree of Dissolution was granted, has resided in numerous residences in the Kansas City area.

B. That the Petitioner has been married twice, and both of those marriages have resulted in dissolutions.

C. That Petitioner has been abused by one of her former husbands in the presence of the minor child.

D. That her present employment has caused her to leave the child for long and extended periods of time.

E. That Respondent has remarried, is gainfully employed, is in a stable position, and is able to provide a proper and stable home for the minor child.

F. That the minor child of the parties has a learning disability problem that requires attention and work with the child, and the Respondent is able to provide same to the child.

G. That the best interests of the minor child would be served by custody being transferred to the Respondent.

Preliminarily, the fact that Jack is now remarried, gainfully employed and able to provide a proper and stable home for the child does not provide a proper basis for a change in custody. These are conditions which are not evidence of a change in circumstances, as the changes in circumstances which must be considered are those of the child or the custodial parent. *Henderson v. Henderson, supra,* 622 S.W. 2d at 10. This evidence is only pertinent as to the fact that the father's home was an acceptable place for the child to live. *Id.* The majority improperly emphasizes the steps that Jack and Laura have taken to work with Robby. Although their efforts are commendable, nonetheless they are irrelevant to the case at hand.

The crux of this appeal hinges on the moves that Lyn has made since her divorce from Jack. Received into evidence without objection, Lyn's exhibit 49 lists those residences and the dates of occupancy.

1. El Chapererall [sic] Apts.—Riverside—June 1979 to July 1980
2. Parkville, Mo.—4 plex—July 1980 to August 1980
3. Butler, Mo.—August 1980 to Nov. 1980
4. 6003 N. Wyandotte—Gladstone, Mo.—Nov. 1980 to Feb. 1981
5. El Chapereall [sic] Apts.—Feb. 1981 to Summer 1981
6. Walnut Grove Apts.—Summer 1981 to Aug. 1982
7. Smithville—Aug. 1982 to May 1983
8. 5308 N.E. 46th St.—K.C., Mo.—May 1983 to April 1986
9. Rt. 2 Box 765—Excelsior Springs—April 1986 to April 1987
10. 2000 W. Jesse James Court—Excelsior Springs, Mo. April 1987 till now. (still)

It is certainly true that the trial court has the prerogative of determining the credibility of the witnesses. *In re Marriage of Scobee, supra,* 667 S.W.2d at 468. However, the evidence in the instant case completely refutes respondent's contention that Lyn had lived twenty places since the divorce and makes such a claim, quite frankly, incredible. Other evidence also refutes this contention. Jack also testified that Lyn had "moved in with Roger and Teresa Fuller." Teresa Fuller (now Teresa Bonebright) testified otherwise; that Lyn had never resided with her. Lyn's moving never interfered with Jack's visitation. He testified that, "she would always call and let me know where she had moved." These moves have never been out of state or away from the area, except for a few months in 1980, when Robby was an infant, Lyn lived in Butler, Missouri. Also worthy of note is the stability shown in the last five years where the pattern of Lyn's moves reveal a more settled existence. When the motion was filed she had resided at the same residence for almost three years.

Jack has moved five times since his divorce from Lyn. He presently resides on a farm in Dearborn, Missouri, but he also has resided in North Kansas City, Riverside, and on a couple of small farms.

The important issue, however, is not the frequency of the moves, but of their effect on Robby.

Robby is a child who has a learning disability. He has a low I.Q. and is enrolled in special classes. Robby is doing well in school. His grade cards show that he is making good progress. Lyn works with Robby on his homework and keeps in touch with his various teachers and counselors; keeping informed about Robby's progress. After she caught him lying about whether he had homework or not she initiated a system to monitor his work, contacting his teachers and requesting a weekly or daily report as to what he had to do. Robby does not necessarily like the system, but apparently it has paid off. His report cards are sprinkled with comments such as, "Robby has shown improvement—thanks to the help at home," and "Thanks, Mom, for your good work [and] help!"

Lyn has also been active in Robby's school activities. She has served as a room mother and she attends PTA meetings and all of Robby's Christmas programs. She is also involved with Robby's development outside of the school room. When Robby was in Cub Scouts she took him to his den meetings, participated in an olympic type scouting event and prepared food for and attended a banquet. She attended his soccer games, took him to swimming sessions, and sent him to vacation Bible School.

Jack's participation in Robby's development is stark by contrast. He has not troubled himself to become better acquainted with the specifics of Robby's education. He could not name any of the schools that Robby had attended, including the school Robby attended at the time of the trial. He couldn't name any of Robby's teachers, special learning disabilities teachers, or counselors. Jack claimed that this was because Lyn denied him access to Rob-

by's records. He did, however, participate in one parent-teacher conference. He did *not* participate actively or regularly in any of Robby's activities. He could not name Robby's Cub Scout pack leader. Robby's "Pinewood Derby" car was sent by Lyn to Jack unfinished as an attempt on her part to let Robby and Jack work on the project together. It was returned in the same unfinished condition. When questioned, Jack could not name who Robby's teacher would be if he were to get custody. He was unable to state who Bobby's principal or counselor would be. How shallow his contention that it was Lyn who prevented his interaction with Robby!

Jack is concerned about Robby's emotional state. During visitation Robby was prone to crying and Jack testified that he believed that this was due to problems Robby was having with his mother. Yet, when Jack picked Robby up to start his visitation Robby was not upset or distraught. Connie Hawkins, one of the co-directors for the school day care program, has daily contact during the school week with Robby. She has never witnessed any outbursts of tears. Lyn testified that he was not prone to tears in her presence.

Lyn did, however, add that on one occasion Robby burst into tears and said, "Mommie, why is everyone fighting over me." Robby has told her that he wants to live with his father. Although Lyn has tried to shield Robby from the custody battle his father keeps Robby fully informed. Robby was upset by this. Lyn testified, "He said, mom, dad told me you were going to take him to court to get more money and he also said that his dad stated that if I did this, then he wouldn't get to see him very often." Jack admits that he has discussed the motion to modify with Robby.

Robby was questioned on the subject, in-camera:

Q. Anybody talk to you about the fact that you were going to come over here to Court?
A. Yes, my dad and him.
Q. You pointed to Mr. Noland?
A. Yes.
Q. Okay. The record doesn't know who him is. Who else talked to you besides your dad and Mr. Noland?
A. Laura. That's all really.
Q. Laura, that's your dad's wife?
A. Uh-huh.
Q. Your mom ever talk to you about the fact you're going to be over here?
A. No.

Further questioning of Robby is also illuminating:

Q. All right. Has your mom promised you anything that if you stay with her, she'll do this, that, or the other thing for you?
A. No.
Q. Has your dad promised you if you come over with me I'll do this, that or the other thing?
A. He told me I could join in 4-H.

The change in circumstances in this case does not justify the transfer of custody from the mother to the father. There is much value in keeping a child with the parent who has custody as opposed to uprooting that child and transplanting him in a new home environment. In fact, "[t]he change in circumstances must be such as to give definite promise that the custody change will benefit the child in a substantial way." *Schmidt v. Schmidt*, 591 S.W. 2d 260, 262 (Mo.App.1979). There is no such definite promise here. Jack seems extraordinarily out of touch with significant events in Robby's life. His ignorance of Robby's education and lack of participation in the child's activities, for whatever reason he offers, is astonishing. The fact that he works with Robby during Robby's visitations cannot be made to obscure these facts. Furthermore, it is difficult to see how a change could *substantially* benefit Robby.

The case of *In re Marriage of Johnson*, 758 S.W.2d 721 (Mo.App.1988), provides some guidance as to what factors establish changed circumstances and what the best interests of the child require. Teddy, the child in *Johnson* was left in the custody of his mother, despite his father's motion to modify. *Id.* This court reversed the trial

court, finding that, "insofar as the trial court required the petitioner to show that the changed circumstances rendered the prior decree unreasonable, the court erroneously declared the law." *Id.* at 724. Thus, this court reviewed the record not under the erroneously declared test but, "to determine whether the circumstances that occurred after the prior decree required a modification in Teddy's best interests." *Id.* at 724. Teddy, an eleven year old, was left alone nights to baby-sit his nephews while his mother was out with her boyfriend. *Id.* at 722. He frequently missed school and at one time was kept out of school for a week to look after his nephews. *Id.* at 723. The factors the court examined in reversing the trial court included a lack of parental supervision, educational neglect, insufficient medical and dental care, and physical and verbal abuse. *Id.* at 725. *Johnson* provides quite a contrast to the facts and circumstances in the instant case.

Robby is doing well in school. His grade reports show progress and improvement. There is no evidence of abuse or neglect of Robby on Lyn's part. Quite the contrary is true. Jack himself has no criticism of Lyn's parenting skills and acknowledges he is pleased at how well Robby is doing in school. Respondent's assertion on appeal that Robby was having significant problems at home and at school is somewhat puzzling and not substantiated by the record.

Laura and Jack both testified as to Robby's emotional state as manifested by frequent crying spells in their presence and explain these spells as having to do with his problems with Lyn. Certainly the strain of the custody battle has been rough on Robby and Jack's conduct in telling Robby about the custody case was, at very best, questionable behavior. There is virtually no evidence as to Robby's crying outside of their presence.

Lyn has indeed made changes of residence in the Kansas City area and has been remarried and divorced twice. She has also had to rely on a latch key program for help with Robby. None of these circumstances alone justify a change of custody, nor do they together compel the conclusion that such a change would be in Robby's best interests.

Many working mothers rely on latch key programs for providing help with their children. Lyn's present employment situation makes one of these programs necessary. It is difficult to raise a child and work at the same time. The trial court's finding, that her present employment has caused Lyn to leave the child for long and extended periods of time, is simply not supported by the evidence. This is not a case like *Dohogne v. Dohogne*, 720 S.W.2d 421 (Mo. App.1986), where a mother sent her children off to relatives from January to June without having any physical contact with them. This is instead a case where day care needs to be provided for the child of a working mother. To find that this constitutes a substantial change upon which a change of custody can be based is to damn all working parents to an uncertain future fraught with the perils of providing a living for themselves and their children, balanced against the danger that placement in a latch key program could cost them custody of their children.

Nor do Lyn's remarriages compel the conclusion the majority reaches. Lyn's marriage to Allen Beerey lasted ten months. During the course of the marriage she was subjected to physical abuse in front of Robby. When asked why she divorced her second husband Lyn responded, "He hit me several times and Robert saw this." Robby himself stated in-camera that he really didn't remember him.

The majority opinion also places importance on the wishes of the child in a modification proceeding. Robby, who was eleven years old at the time of the trial, had indicated to Laura and to his mother that he would prefer to live with his father. This does not justify the transfer of custody. The wish of a child, of Robby's age, to live with a certain parent is not a sufficient basis upon which a change of custody can be made, as the issue of modification is far too important to be left to the whims or desires of the child. *In re Marriage of*

*Thompson, supra,* 682 S.W.2d at 851. *See also Engler v. Engler,* 455 S.W.2d 36, 41 (Mo.App.1970). This is not to say that the wishes of a child are totally irrelevant to the proceedings. These wishes should be considered as a factor in the decision but should be followed only if the welfare and interest of the child are consistent with that preference as determined by the whole of the evidence. *See In re Marriage of Thompson, supra,* 682 S.W.2d at 851; *Knoblauch v. Jones,* 613 S.W.2d 161, 167 (Mo.App.1981).

Robby usually visits with his father on alternate weekends although there have been visits of longer duration. He visits on a farm, where he is also taken to see his grandparents and cousins. Jack takes him fishing and camping. He is responsible for keeping his room clean and burning the trash. On the other hand, Lyn is responsible for Robby during the school week. She enforces the rules about homework and disciplines him when necessary. He has also been kept informed of the custody proceedings by Jack. Jack's attorney has also talked with him concerning the proceedings, as has Laura. Lyn has not talked to him nor has she promised him anything for wanting to stay with her. Under the circumstances it is easy to see why the boy would wish to live with his father.

It is also unfortunate that the disposition which should be made in this case would result in the child being transferred from his father's custody back into his mother's custody. This is indisputably hard on the child. Yet, the old adage, that two wrongs do not make a right, is certainly applicable to the case at bar.

The evidence in the instant case falls short of what is required to make the necessary showing that there are sufficient changed circumstances which would require that a change of custody be made. Nor does the evidence, "give definite promise that the custody change will benefit the child in a substantial way." *Schmidt v. Schmidt, supra,* 591 S.W.2d at 262. Therefore, as there is no substantial evidence to support the judgment of the trial court, the order of modification should be reversed.