**C.L. RICHARDSON, d/b/a Richardson Construction, and Engineering Surveys & Services, Inc., Respondents,**

v.

**COLLIER BUILDING CORPORATION, Appellant.**

**No. WD 42302.**

Missouri Court of Appeals, Western District.

May 8, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 3, 1990.

Application to Transfer Denied Sept. 11, 1990.

David A. Johnston, Columbia, for appellant.

David L. Knight, Columbia, for Richardson.

Stephen C. Scott, Columbia, for Engineering Surveys.

Before GAITAN, P.J., and CLARK and MANFORD, JJ.

GAITAN, Presiding Judge.

Respondents Engineering Surveys & Services, Inc., and C.L. Richardson filed suit seeking payment for services under contract. The appellant counterclaimed for damages he alleged were incurred from a failure of the respondents to perform as contracted. The trial court held for respondent, Engineering Surveys & Services, Inc., and against respondent, C.L. Richardson, and against defendant on its counterclaim.

On appeal the appellant alleges the trial court erred by: (1) permitting the use of its project superintendent's deposition and thereafter holding that said superintendent had authority to act for defendant; (2) permitting respondents to amend their pleadings to conform to the evidence; and (3) by permitting evidence of failure to mitigate damages and waiver of contract provisions. We affirm.

The facts herein, though extensive, are necessary to a full understanding of the

case. Appellant Collier Building Corporation (hereinafter Collier) is a Missouri corporation with offices in St. Charles, Missouri. Collier is in the business of acting as general contractor for building projects. Donald G. Collier, Jr. (hereinafter "Don Collier"), the general manager in charge of the day-to-day operations of Collier Building Corporation, also served as the project manager for the Vandiver Square project, the subject of this case. Don Collier has been involved in the construction business since 1973, and at the time of trial, had been involved in constructing 300 to 500 residential structures and 5 to 10 commercial buildings.

Before commencing the Vandiver Square project, Don Collier had been involved in construction projects entailing the use of "engineered fill," with respect to which he knew the following: That fill has to be compacted to a certain standard to be sufficient to build upon; that the degree of compaction is generally ascertained by testing each layer or "lift" of fill as it is laid down; that problems can arise if soil is inadequately compacted; and that, depending on how the building is constructed, such problems can include shifting of the foundation, settling of sewer, water and electrical lines, and doors not opening properly. Don Collier also knew that the only way to ascertain the degree of compaction is through appropriate testing.

Don Collier purchased Vandiver Square with the idea of developing two buildings thereon. After the site was purchased, he contracted with Allstate Consultants to prepare a site development plan and obtain necessary approvals from the City of Columbia. Allstate Consultants is operated by Ron Shy (hereinafter "Shy"), a registered land surveyor, who has engineering degrees. Allstate performs site design, land surveying and subdivision design. On the Vandiver Square project, Allstate made a boundary survey of the property, prepared and filed preliminary and final plats with the city, designed an off-site sanitary sewer connection, and prepared a site and grading plan.

At Don Collier's request, Shy prepared bid packages to go to soil contractors, one of which was given to C.L. Richardson (hereinafter "Richardson"). Don Collier telephoned Richardson on August 12, 1987, and asked him to pick up a bid package from Shy. No detailed soil compaction specifications were prepared for the project, but Shy's office communicated to Richardson that the fill was to be compacted to 95% optimum compaction.

For soil compaction testing services, Shy referred Don Collier to respondent, Engineering Surveys and Services, Inc. (hereinafter "ES & S") which is certified by the Missouri Board of Architects, Professional Engineers and Land Surveyors to practice engineering. Larry L. Hendren (hereinafter "Hendren") is the president and a shareholder of ES & S. Hendren, who had 10 years of experience in soil testing, testified that Don Collier initially telephoned him about soil testing for the Vandiver Square project in late July or early August, 1987; Don Collier testified that the telephone call was on August 12, 1987.

On August 19, 1987, Don Collier went to Shy's office and reviewed the bids from soil contractors. On August 20, 1987, Don Collier returned a telephone call from Hendren relative to ES & S's proposal for soil testing on the Vandiver Square project. During that conversation, Don Collier told Hendren that Richardson would likely be the earth-moving contractor.

Richardson made his bid on the job from the plans provided by Shy. These plans included clearing the site of trees and buildings, and moving and compacting 15,-100 cubic yards of earth, with compaction to meet a 95% standard; all for the lump-sum price of $18,500. There was a dispute in the evidence whether Richardson was informed before the job that ES & S was to perform soil compaction tests. Richardson testified that he did not know Collier had hired ES & S to perform tests. Don Collier testified he told Richardson in early September that ES & S would do the testing and that Richardson should coordinate his efforts with Hendren. Shy testified he

never discussed with Richardson who had the testing contract.

On or about August 20, 1987, Hendren mailed to Don Collier ES & S' proposal for providing soil testing services on the Vandiver Square project. The proposal contemplated field compaction tests being done over a period of time with each layer or "lift" of soil being tested after it had been placed and compacted. The proposal was received in Collier's office on August 24, 1987. On September 9, 1987, Don Collier called Hendren and told him that Richardson had been awarded the earth-moving contract, and that he wanted ES & S to do the compaction testing pursuant to its proposal. Don Collier stated to Hendren that he thought Richardson was probably beginning the preliminary scraping, grubbing and demolition work, and that ES & S should proceed to obtain its soil samples in order to be ready for compaction testing when Richardson began filling operations.

There was a conflict in the evidence whether Hendren, on behalf of ES & S, made a special agreement with Don Collier to constantly monitor the site or coordinate with Richardson to ascertain when fill was being placed, in order that compaction tests could be performed at the proper intervals. Hendren testified he did not make such a special agreement. Don Collier testified to the contrary, stating that in the absence of a special agreement, the general rule is that the general contractor notifies subcontractors when their work on the job is needed.

On September 9, 1987, Collier hired Jim Ford (hereinafter "Ford") to be the building superintendent on the Vandiver Square project. Ford, whose first day on the job was September 14, 1987, reported directly to Don Collier, and served as on-site representative of Collier for the construction project. In the early stages of the project, when the grading and foundation work was being done, Ford was the only Collier on-site employee present on a regular basis. Don Collier himself visited the site every other week. Ford worked only on the Vandiver Square project during its construction. Concurrent with his work on Vandiver Square, Don Collier also served as project manager for Fort Zumwalt Square in O'Fallon. According to Don Collier, with respect to minor problems, Ford had the authority to require workmen to change or modify the work. With respect to major issues, Ford was to consult with Collier, but would have the authority to tell workmen to stop work until the problem could be resolved or until he could check with Collier. However, Don Collier never told Hendren or Richardson there were any limitations on Ford's authority because he never discussed Ford with either Hendren or anyone on behalf of ES & S or Richardson.

On September 10, 1987, ES & S sent a technician to the Vandiver Square project site to collect soil samples for laboratory tests. ES & S conducted the laboratory tests on September 14, 1987, and mailed the results to Collier on or shortly after September 17, 1987. The purpose of the test was to derive data for each soil type, indicating the maximum dry density of the soil and the optimum moisture content. This laboratory data would later be used as a comparison basis for testing the actual soil compaction on the site. The peak of the curve on the laboratory graphs is the theoretical maximum dry density of the soil. ES & S planned to do later field testing of in-place compacted soil with nuclear density meters, which can measure as much as the top 12 inches of soil.

The time sheets of Richardson's equipment operators indicate that substantially all their work on Vandiver Square was completed by September 23, 1987. During the course of the soil work, Richardson did not see any engineers making soil compaction tests, and he asked Ford if Collier was having soil compaction tests made. Ford responded, "No, it looks good to me." Richardson's employee, Darrell Durham, personally cleared the entire Vandiver Square site and later operated the roller used to compact lifts of fill soil. He worked on the project every day except when it rained. Ford was present on the site but did not tell Durham that work needed to be held up so testing could be done. When approached, Ford said,

"Things are looking fine," and to keep on going. Richardson's employee, John Dometrorch, was involved in 25 or 30 percent of the fill work, and Ford was on the job site when Dometrorch was working. Neither Durham nor Dometrorch ever saw Don Collier on the site.

David A. Bennett (hereinafter "Bennett"), an engineer and shareholder in ES & S, was responsible for scheduling ES & S technicians. He drove by the Vandiver Square site on September 14, 15 and 16, 1987, and saw nothing that appeared to be recently placed fill. He did not drive by the site on September 17 and 18, 1987. Returning from lunch at home on Monday, September 21, 1987, he drove by the site once again and noticed some fill was in place. He stopped his vehicle and had a brief conversation with a person whom he believed to be an employee of Richardson, who told him that a "good majority" of the fill was already in place. Bennett reported this conversation to Hendren. Between September 9, 1987, and September 21, 1987, no one from Collier, Allstate Consultants or anyone else connected with the Vandiver Square project had notified ES & S that fill was being placed and that field compaction testing was needed.

Toward the end of September, 1987, Don Collier visited the Vandiver Square site, at which time the dirt work was virtually done. Don Collier asked Ford if he had received any soil compaction test results, and Ford said no; so Collier asked Ford to contact ES & S. Ford telephoned Hendren about the middle of the afternoon on September 21, 1987, and said that he was ready for tests. Hendren told Ford that he understood the fill was "about in," and Ford responded, "Well, if it's not in by now, it will be by the time you all get out here, by the end of the day anyway." Hendren then told Ford that it would be a waste of time and Collier's money to test the top 12 inches of an 11- or 12-foot fill because ES & S could not certify to the compaction of soil below 12 inches. Ford said he would discuss the matter with Collier and get back in touch with Hendren.

Ford telephoned Don Collier on September 21, 1987, to report his conversation with Hendren. Don Collier was aware at that time that compaction testing still could have been performed by alternative methods such as digging test pits or drilling core samples. Thereafter, no one from Collier ever asked ES & S to return to the site to perform soil compaction testing or asked Richardson to recompact any soil.

Instead, Collier contracted with Gene Moore (hereinafter "Moore"), a self-employed concrete contractor, to install concrete footings, floors and walls. The lower, walk-out portion of the building was to have frost footings 12 inches wide and 36 inches deep. When Moore's crew began digging the frost footing trench on the east side of the building, the sides of the trench kept crumbling; Moore felt the soil was not compacted and reported the problem to Ford. Ford telephoned Don Collier about the matter and told him that both the city inspector and Moore were recommending that 13 piers be installed under the footings; Ford gave him Moore's estimate for the additional work. Collier authorized the piers to be installed. No engineer was consulted, no soil compaction tests were performed where the piers were installed, and no one re-compacted the soil in the area. Moore's bill for the piers, dated October 13, 1987, was $1,813.00.

Thereafter Collier continued construction on the existing building. There were never any soil compaction tests done on the soil under that building. Don Collier explained that he did not have tests done because "... the building site that was currently being built, the sub-grade was cut. Jim [Ford] indicated that the footing area looked good ... ... the footing stability area looked good. And I didn't—I elected not to have any testing done on that—on Building No. 1."

Collier did not order any further soil compaction testing at the Vandiver Square site until February, 1988. At that time, Soil Consultants of St. Peters, Missouri dug some test pits on the site of and adjacent to the proposed future building, to obtain soil samples for compaction testing.

The tests indicated that in the area in which the pits were dug, the soil compaction did not meet the 95% compaction standard.

On or about October 1, 1987, ES & S submitted a bill to Collier for $467 for the preliminary soil sampling and laboratory testing performed by ES & S on September 14, 1987. The amount was in accordance with the hourly rates and laboratory fee set out in the written proposal ES & S had sent to Collier. After receiving the bill, Don Collier called Hendren on October 6, 1987, and told him that the bill would not be paid. Hendren explained his concerns about soil compaction testing on the top 4–12 inches of an 11–12 foot fill. Hendren also told Collier that Ford had said he would contact Collier about the situation and get back in touch with ES & S, but ES & S "never heard another word." On October 6, 1987, Hendren wrote a letter to Collier outlining the situation and enclosing a more detailed itemization of ES & S' bill. Don Collier testified the initial tests run by ES & S were of no value to him and were not used by him on the job. On October 23, 1987, ES & S filed a small claims court action against Collier to recover $467, and on March 4, 1988, filed a mechanic's lien. On March 21, 1988, ES & S filed a first amended petition against Collier.

In December, 1987, Collier paid Richardson $18,000 on his $18,500 contract. The payment was authorized by Don Collier. Don Collier was aware at the time he authorized payment to Richardson that the fill had not been tested for compaction as it was being installed. Don Collier also knew when he paid Richardson that Collier Building Corporation had incurred an extra expense for the piers installed by Moore, whose bill was dated October 13, 1987. The only reason Don Collier withheld $500 from Richardson's payment was that he felt Richardson should have removed some trees along a property line that Richardson did not remove because of a question of liability to the adjoining property owner. If the trees had been taken out, Don Collier testified he would have authorized payment of the full $18,500. On March 30, 1988, Richardson filed suit against Collier in the

associate division of the Boone County Circuit Court to recover the $500 unpaid on Richardson's contract.

Collier filed counterclaims against both ES & S and Richardson, alleging damages resulting from failure to test fill compaction and failure to compact fill to specification. The damages claimed at trial by Don Collier included $1,813 for the piers, $140 for soil compaction done in a parking lot area, $23,656.35 for anticipated removal and recompaction of soil on the site of the planned future building, and $6,000 for damage anticipated to driveway and parking lot asphalt from heavy equipment.

The cases were consolidated for trial pursuant to the parties' joint motion. The consolidated case was tried and the parties thereafter submitted post-trial briefs. The trial court entered findings of fact, conclusions of law and judgment finding against Collier on its counterclaims, finding against Richardson on his $500 claim on the ground of impossibility of performance, and finding in favor of ES & S on its claim against Collier for $467. Thereafter, Collier filed this appeal.

### I.

In conclusion of law no. 1, the trial court stated: "The deposition of the job superintendent of Collier, James Ford, taken on September 16, 1988, is admissible in evidence and constitutes admissions of a party's agent per Rule 57.07(A)(3) Missouri Rules of Civil Procedure...." It appears that the trial court treated the deposition not only as admissible under Rule 57.-07(a)(3) but also as the admission of a party, namely, appellant Collier. As the admission of a party, the deposition was admissible in evidence under Rule 57.07(a)(2) without any showing as to the availability of James Ford to testify in person.

Additionally, Ford's deposition shows the knowledge of appellant's agent, Ford, as to the events that occurred during the construction job, and that such knowledge is imputable to appellant.

It is apparent that Ford was to act as Don Collier's eyes, ears and mouth

on the Vandiver Square project. By Don Collier's own admission, Ford had the authority to require workmen to correct minor problems. As to major issues, Ford would have the authority to tell workmen to stop work until the problem could be resolved or until he could check with Collier, and Ford was to consult with Collier on such issues. These circumstances mandate application of the rule that knowledge of an agent while acting within the scope of authority and with regard to any business over which his authority reaches is knowledge of the principal. *Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer, Inc.*, 476 S.W.2d 153, 155 (Mo.App. 1972). In *Eveready*, the defendant's counterclaim for defective guttering installed in its warehouse was unsuccessful because the counterclaim was filed more than one year after installation and defendant was held to be bound by the knowledge of its agents as to a one-year warranty on the guttering. Likewise, in the instant case, Collier is bound by Ford's knowledge of what transpired on the Vandiver Square construction site. *See also Hotchner v. Liebowits*, 341 S.W.2d 319, 326–27 (Mo. App.1960) and *Brown v. Kroger Co.*, 344 S.W.2d 80 (Mo.1961).

In *German v. Kansas City*, 512 S.W.2d 135 (Mo. banc 1974), the Missouri Supreme Court held it was error for the trial court to have excluded the deposition testimony of one Ralph J. Blackmore, who supervised a road project in Kansas City for Tri–City Construction Company. The trial court had held, "there is no showing that Mr. Blackmore is a managing officer, managing agent, of the corporation, of defendant Tri–City, and is not therefore an individual having capacity to bind corporate defendant by statements made in deposition or any place else." *Id.* at 145. In reversing this holding, the Supreme Court noted Blackmore's ongoing familiarity with the construction site due to his day-to-day supervision thereof and stated that the deposition should have been admitted into evidence.

For the aforesaid reasons, Ford's knowledge gained from his observations and activities on the job site are deemed to be the knowledge of appellant Collier. In fact, Ford's indifference to the need for soil compaction seems to be mirrored by Don Collier's failure to immediately act to correct this omission once informed. The September 16, 1988, Ford deposition was properly admitted as admissions by a party showing Collier's knowledge of occurrences on the construction site.

Appellant's reliance on *Goff v. St. Luke's Hospital of Kansas City*, 753 S.W.2d 557, 566 (Mo. banc 1988), is misplaced. In *Goff*, the Supreme Court found that the trial court erred in admitting the deposition of a nurse, but the error was not found to be prejudicial and thus did not require reversal. Unlike *Goff* where the nurse was not a managerial person, Ford was clearly an extension of management. In arriving at this holding, the Supreme Court pointed out that the deposition testimony "was given under oath, with all parties having the right to full examination." The same occurred in the instant case. Further, the deposition testimony was consistent with other evidence in the case.

Besides contesting the admissibility of the September 16, 1988, Ford deposition, appellant contends that admission of the deposition was prejudicial to appellant for two reasons: First, because appellant allegedly had no opportunity to make objections to the substance of Ford's deposition testimony at trial, and, second, the deposition was allegedly the "only source" of certain evidence relied upon by the trial court.

Taking up appellant's first contention of prejudice, it should be noted that the issue of admissibility of the Ford depositions was left to post-trial submissions. Both respondents pointed out portions of the Ford depositions they wished to have the trial court consider in their post-trial briefs. Appellant, on the other hand, contented itself with objecting to admissions of the depositions in their entirety on legal grounds and failed to set out specific objections to those portions of the depositions offered by respondents. Appellant may not now be heard to say it had no opportunity to interpose such objections.

With respect to appellant's second contention of prejudice, a comparison of Ford's September 16, 1988, deposition testimony with other evidence available in the record, indicates that the deposition was both consistent with and cumulative of the testimony and other evidence at trial. In fact, there was no reference to said deposition statements in the trial court's finding of fact.

Hence, the trial court properly admitted the September 16, 1988, Ford deposition.

## II.

■ We believe the trial court properly considered the defenses of waiver and failure to mitigate because evidence relevant to these issues was introduced at trial without objection by appellant.

Before proceeding further, it should be noted that appellant's brief is in error in stating that both respondents moved after trial, but before entry of judgment, to amend their replies to appellant's counterclaim. Actually, only respondent ES & S formally moved to amend. Respondent Richardson relied on the provision of Rule 55.33(b) that failure to formally amend does not affect the result of the case.

In *Biehle v. Frazier*, 360 Mo. 1068, 232 S.W.2d 465 (1950), the Missouri Supreme Court held that where the plaintiff's evidence was at variance with her petition, but the evidence came in without defendant's objection and without any claim of surprise on defendant's part, the plaintiff "would be entitled to amend her petition to conform to the proof and to a submission of her case upon that [proof]." The Supreme Court went on to hold that amendment may be made at any time, even after judgment, but "failure to so amend does not affect the result of the trial on these issues." *Id.* 232 S.W.2d at 467. In *Biehle*, plaintiff's petition alleged she was injured when the defendant cab driver "started with a jerk," but plaintiff's evidence and jury submission was that the defendant started the cab before plaintiff was seated, causing plaintiff to fall back and injure herself.

There are other cases with similar outcome which are worthy of note. *Offen-*

*backer v. Sodowsky*, 499 S.W.2d 421 (Mo. 1973) (plaintiff allowed to add specific negligence allegation to conform to evidence); *Middleman v. Complete Auto Transit, Inc.*, 486 S.W.2d 456 (Mo. banc 1972) (plaintiff allowed to amend petition to allege specific negligence in applying brakes such that tractor-trailer unit jackknifed because issue tried by implied consent); *Steele v. Woods*, 327 S.W.2d 187 (Mo.1959) (plaintiff's petition alleged general medical malpractice, but specific failure to give paravertebral block anesthesia was tried without objection and instructed upon); and *Montgomery v. Travelers Protective Association of America*, 434 S.W.2d 17 (Mo.App. 1968) (where defendant was fully aware of what proof was necessary to sustain plaintiff's claim and defendant's defense, and claimed no surprise, plaintiff was properly allowed to amend petition to allege essential element of case). *See also Coca–Cola Bottling Co. v. Groeper*, 691 S.W.2d 395 (Mo.App.1985) (general denial by defendant rather than asserted affirmative defense was cured by trial of issue without objection).

The facts adduced at trial relevant to the waiver issue are set out in point I above. Facts relevant to the failure-to-mitigate issue will be briefly restated as follows: The bulk of the fill work was finished by Monday afternoon, September 21, 1987, when Ford first called ES & S to inquire about soil compaction tests. It would not have been practical at that point to have tested compaction as originally contemplated. However, compaction still could have been tested by using test pits or drill cores, a fact of which Don Collier was aware. Don Collier knew that testing is the only reliable way to ascertain the degree of compaction of fill. After becoming aware that no compaction testing had been done, Don Collier also learned that the sides of the footing trenches were crumbling. After September 21, 1987, no representative of Collier ever asked ES & S to return to the site to perform compaction tests nor asked Richardson to recompact any soil. Instead, Collier had piers installed under part of the footing of the existing building at a cost of

$1,813 without having any soil compaction tests done in the area and without consulting any design professionals. Collier had compaction done in a parking lot area for $140. There was no evidence in the record of any soil tests showing compaction was insufficient in that area. Collier also constructed asphalt driveways and parking lots, for which it claims future damages of $6,000. Under these circumstances, the issues of waiver and failure to mitigate were tried by implied consent under Rule 55.-33(b), which provides in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issued may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Appellant's reliance on several cases which hold that pleadings can be amended by implied consent only when the evidence is solely relevant to an unpleaded issue is misplaced. First, these cases orginated in small claims court and the associate division where formal pleadings are not required. Mo.Rev.Stat. § 517.031 (1986); Rule 152; *Atkins v. Clark*, 644 S.W.2d 365, 368 (Mo.App.1982). Second, appellant cannot claim it was surprised because all of the facts relevant to waiver and failure to mitigate were known to Collier, and, in fact, most of such facts were offered in evidence by Collier. *Sims v. Freeman*, 641 S.W.2d 197, 199 (Mo.App.1982). Third, in this court-tried case, there was no danger of a jury becoming confused or prejudiced by evidence outside the pleadings. Appellant speaks of an alleged unfairness in this case by allowing amendment of the pleadings through implied consent. Actually, the unfairness would be in allowing appellant to take advantage of technical rules to exclude defenses to which it had full prior knowledge of the relevant facts.

Additionally, respondent Richardson pleaded in its reply to appellant's counterclaim:

> Further replying, Plaintiff states that *Plaintiff had no duty to make or obtain any soil compaction tests* and that all soil compaction and soil moving, etc. was properly performed by Plaintiff as specified by the agreement between Plaintiff and Defendant *and performed under the direct supervision of the job foreman of Defendant and at the express direction and upon the express direction of the job foreman of Defendant* who was at all relevant times acting within the scope of his authority as the agent of Defendant.

[Emphasis added.] The fair intent of the emphasized language is that Collier's agent directed Richardson to proceed with his work without requiring soil compaction tests—an allegation which goes to the heart of the waiver issue as set out under point I above. It should also be noted that another issue relevant to the waiver issue, that Collier paid Richardson $18,000 on his $18,500 contract, was pleaded in Richardson's petition against Collier. Under Missouri's "fact" pleading system, Richardson was not required to specifically mention the word "waiver" in his pleadings. Viewed in this light, Richardson's reply contained a more than sufficient statement of the waiver defense.

Turning to the reply filed by respondent ES & S to appellant's counterclaim, it stated:

> Further replying, state that Defendants waived Plaintiffs' performance of the agreement, and are estopped from enforcing said agreement against Plaintiffs, because Defendants failed to notify Plaintiffs when fill was being placed on the construction site.

Here, wavier is pleaded in explicit terms with reference to the (undisputed) fact that Collier failed to notify ES & S when fill was being placed on the construction site.

Considered as a whole, respondents' replies clearly convey the essential idea of waiver, that Collier knowingly proceeded with construction of the Vandiver Square

project without directing Richardson to proceed with soil compaction testing and without requiring ES & S to perform such testing. These were knowing relinquishments of contractual rights by Collier through its job superindent or at least indifference on the part of Collier to those provisions of Richardson's contract.

Hence, we believe the trial court properly considered the issues of waiver and mitigation of damages because they were either tried by implied consent, or the trial court properly considered the issue of waiver because it was sufficiently pleaded by respondents. It should also be noted that respondents' latter contention relates back to its first contention. That is, if respondents' replies raised the issue of waiver even in a limited way, then the trial court properly considered waiver as having been tried by implied consent because the defense was "not thereby substantially changed." *Hatton v. Sidman*, 169 S.W.2d 91, 95 (Mo.App. 1943).

### III.

The arguments raised in appellant's points four and five relate to the affirmative defenses of failure to mitigate and whether Collier waived the contract provision of "engineered fill." After becoming aware that no compaction testing had been done, Don Collier also learned that the sides of the footing trenches were crumbling. Collier never requested nor performed a compaction test.

■ What could Collier reasonably have done when it became aware no field compaction tests had been done? It could have asked that ES & S or some other soils consultant to perform soil compaction tests at that point. If those tests had revealed deficient compaction, Collier may have had the right under its contract with Richardson to insist that Richardson recompact and pay for any necessary re-testing after recompaction. It certainly could have withheld payment on Richardson's contract if he did not perform. Richardson's equipment was still on site on September 21, 1987, when Don Collier learned that soil compaction tests had not been done, so

Collier easily could have asked that testing and recompaction, if necessary, be done at that time.

What did Collier do instead? It unreasonably proceeded to put up its building, install piers not proven to be necessary because no engineering had been done, install parking lots and driveways, and thereby placed more burden on the filled area slated for a future building. In other words, instead of mitigating damages, Collier likely compounded its damages.

Accordingly, Collier was barred from recovery of damages under the theory of mitigation of damages. The general rule is that "[d]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." *Restatement (Second) of Contracts* § 350 (1982). Missouri follows the *Restatement*, and in a relatively recent case of *Wolf v. Missouri State Training School for Boys*, 517 S.W.2d 138, 142 (Mo. banc 1975), the Missouri Supreme Court reaffirmed the principle that one damaged by breach of contract must make reasonable efforts to minimize resulting damages.

*American Surety Co. of New York v. Franciscus*, 127 F.2d 810, 816 (8th Cir. 1942) applied Missouri's well established rule of the duty to mitigate damages and the principle that such a duty arises once the promisee learns that the contract has been breached. Therefore, Collier should be charged with the responsibility of avoiding excessive damages. In fact, with the possible exception of additional costs for testing, it would appear that nearly all of the damages claimed by Collier could have been avoided if Collier had taken the reasonable steps suggested above.

Our review in this case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), which states:

... the trial court's judgment is to be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. Reversal on the ground that the judgment is against the weight of the evidence should be exercised with caution

and only with a firm belief that the decree is wrong.

■ Appellant asserts the trial court erred when it stated in its findings of act and conclusions of law that ES & S "... did not have a duty to monitor the progress of the soil compaction of the Vandiver Square job so that it could perform the tests which it was hired to perform." There was a conflict in the evidence whether Hendren on behalf of ES & S made a special agreement with Don Collier to constantly monitor the site or coordinate with Richardson to ascertain when fill was being placed so that compaction tests could be performed at the proper times. Hendren testified he did not make such a special agreement. Don Collier testified to the contrary. The trial court resolved this dispute in favor of Hendren and ES & S. The trial court concluded that "ESS did not make special agreement with Collier to monitor the site of the Vandiver Project to ascertain when field compaction tests of fill were needed." Due regard is to be given by appellate courts to the trial court's opportunity to judge the credibility of witnesses. *Lopiccolo v. Lopiccolo,* 547 S.W.2d 501, 503 (Mo.App.1977).

The trial court also concluded, "Absent a special agreement to the contrary, it was the duty of the general contractor, Collier, to notify subcontractor [ES & S] when its performance of field compaction testing was needed on the Vandiver Project and Collier breached its agreement with [ES & S] by failing to notify [ES & S] when field compaction tests were needed."

Clearly, the trial court's findings of fact that ES & S did not make a special arrangement to monitor the job site and that neither Don Collier nor anyone else notified ES & S when the field compaction testing needed to be done are dispositive in ES & S' favor. "When the owner, or someone standing in his stead, prevents a contractor from completing performance, the contractor's failure to complete his work is excused, and he is not regarded as having breached the contract." *Curators of the University of Missouri ex rel. Shell–Con, Inc. v. Nebraska Prestressed Concrete Company,* 526 S.W.2d 903, 911 (Mo.App. 1975).

We believe that the record fully supports the trial court's findings of fact, and we do not believe the trial court abused its discretion.

■ The primary concern of the appellate court when reviewing court-tried cases is the correctness of the result the trial court reached, and the trial court's judgment is to be affirmed if it is correct under any reasonable theory supported by the evidence. *Randel v. McClanahan,* 760 S.W.2d 607 (Mo.App.1988).

## IV.

■ As a corollary to point V, it is also clear that Collier waived its contract provision with Richardson by failing to provide soil compaction tests as stated in said contract. It was an implied provision of the Richardson–Collier contract that Collier would provide for such tests in the first instance. The contract itself does not contain any requirement for Richardson to conduct or obtain soil testing; if such had been intended by Collier, it clearly could have been stated in the contract. The only obligation undertaken in the contract by Richardson was to make payment for retesting of soils not to perform the testing, in the event that the initial testing to be paid for by Collier showed compaction was insufficient. This interpretation of the contract is borne out by Don Collier's own testimony. He stated that he contracted separately for soil testing, that he expected to pay for the cost of the initial tests, and that Richardson was not expected to test himself. Richardson had no way of knowing whether compaction met the 95% standard without the testing being provided by Collier.

The conclusion by the trial court that Collier breached its contract with ES & S by failing to notify ES & S when tests were needed leads inexorably to the conclusion that Collier also breached its contract with Richardson by failing to provide soil compaction testing. The trial court concluded that Collier's failure to notify ES & S di-

rectly resulted in Collier's failure to provide such tests.

Since Collier breached its contract with Richardson by failing to provide for soil tests, Richardson's performance as to the 95% compaction standard was excused. *Curators of the University ex rel. Shell–Con, Inc. v. Nebraska Prestressed Concrete Company*, 526 S.W.2d at 911. The trial court's judgment is to be affirmed if it is correct under any reasonable theory supported by the evidence. *Randel v. McClanahan*, 760 S.W.2d at 607.

For the aforesaid reasons, the judgment of the trial court is affirmed.

All concur.